Kenneth D. GOLDBERG

v.

Dana WHITMAN, Jr., et al.

Civ. No. H–88–840 (AHN).

United States District Court, D. Connecticut.

July 23, 1990.

Reconsideration Granted Aug. 15, 1990.

See also, 740 F. Supp. 118.

944

Martin S. Stillman, Stillman & DiCara, Rocky Hill, Conn., for plaintiff.

William S. Zeman and Joel M. Ellis, West Hartford, Conn., for defendants.

## RULING ON MOTION FOR SUMMARY JUDGMENT

NEVAS, District Judge.

This case raises the complex question of whether a court may consider a legislator's motive in enacting a statute where that statute is, in all other respects, constitutionally valid. This is a claim by a former supernumerary police officer of the Town of Rocky Hill, Connecticut against the Town, the Town Manager, the Mayor and the members of the Town Council. Kenneth D. Goldberg alleges that after he sided with the Rocky Hill Police Chief in a dispute over racism within the police department he was subjected to a campaign of harassment and eventually discharged when the Town Council voted to eliminate the supernumerary program entirely. Goldberg asserts that these actions were motivated solely by a desire to retaliate against him for having exercised his first amendment right to speak out on an issue of public concern.

The defendants have now moved for summary judgment. For the reasons set forth below, the motion is granted only as to defendants Waldron and Delaney and denied as to all others.

I. *Background*[1]

Plaintiff Kenneth D. Goldberg had been a supernumerary police officer in the Town of Rocky Hill for a number of years prior to 1987, when the events germane to this lawsuit took place. In 1984 Goldberg was selected officer of the year by the Rocky Hill Police Department. *Goldberg Affidavit* ¶ 4. By 1987 Goldberg was commander of the supernumeraries[2], wore a uniform indicating his rank and received a higher rate of pay than his fellow officers. *Id.* ¶ 7. At various times the Town Council had permitted Goldberg to attend out-of-state training programs in crime prevention at Town expense. *Id.* ¶ 3. In his affidavit Goldberg states that he "enjoyed a good working relationship with the Town Manager and the Town Council." *Id.* ¶ 3. In a 1985 memorandum, Town Manager Dana Whitman, Jr. stated that Goldberg had "done an outstanding job as part-time Crime Prevention Officer" and commended his "interest and dedication." *Goldberg Affidavit* ¶ 14 (Attachment B–18).

On or about April 7, 1987 Lt. Herbst of the Rocky Hill Police Department ("the Department") cancelled the dispatch of a police cruiser sent to investigate a report of two suspicious looking men driving around a mall parking lot. Complaint ¶ 5. The report referred to the two as only "Puerto Ricans" and "suspicious looking." *Id.* Soon after the cruiser was recalled the Department received a civilian complaint that an automobile had indeed been stolen from the area in which the two individuals were sighted. Lt. Herbst filed a report on the incident, stating that he felt race should not be a factor in determining whether or not to stop a person and describing what he termed "pervasive racism" within the Department. *Id.* ¶ 6. Lt. Herbst also noted Police Chief Philip Schnabel had advised him "that in the future a unit should be dispatched and that a supervisor also respond in order to monitor the situation and ensure that no constitutional infringements or dangerous procedures occur." *Riley Affidavit* ¶ 2 (Attachment A). Herbst stated that he would "comply with the Chief's advisement if such situation arises in the future." *Id.*

In response to the civilian complaint Chief Schnabel found that "Lt. Herbst acted in the best interests of the Department in attempting to avoid a possible constitutional violation based on race," *Whitman Affidavit* ¶ 17 (Attachment I), and held the lieutenant to be "Exonerated." This ruling was in apparent reference to the Department's established procedure for processing civilian complaints. Written guidelines provide that after investigation a final report shall reach one of the following conclusions: Unfounded, Exonerated, Unsubstantiated or Substantiated. "Exonerated" is defined as "[i]ncident occurred, but was in compliance with proper procedures." *Id.* ¶ 19 (Attachment J).

On June 15, 1987 the Town Council held a meeting, attended by Town Manager Whitman and Mayor Paul Doukas, at which the propriety of Lt. Herbst's actions was discussed. Asked to present his position, Chief Schnabel stated that under the law as he understood it "probable cause would have been needed prior to stopping this vehicle and there was not probable cause." *Whitman Affidavit* ¶ 18 (Attachment D). Although the Chief acknowledged that Lt. Herbst had made a mistake and in the

---

1. The defendants have moved to strike the affidavits submitted by Goldberg in opposition to the summary judgment motion. They argue that the affidavits contain hearsay, are not based on personal knowledge, cite irrelevant documents and contain inadmissible evidence of legislators' motives. The court grants this motion and in its recitation of facts relies only on affidavit testimony that would be admissible at trial. *See* Rule 56(e), Fed.R.Civ.P.

2. Defendants contend the Town Council never approved a position of "Commander" of supernumeraries. It is clear, however, that the position had been in existence at least on an informal basis since 1982 and carried with it actual supervisory authority over the other supernumeraries. *See Goldberg Affidavit* ¶ 14 (Attachment B).

future police cruisers *would* respond to similar calls, he felt no need to take disciplinary action against Lt. Herbst as he "had an excellent record and has used his judgment." *Id.* Throughout the meeting the Chief defended this position against repeated criticism by the Town Council members and a number of Rocky Hill residents. *Id.* at 10–16.

Goldberg contends that after Chief Schnabel made his position known at this public meeting he (Goldberg) expressed his support for the Chief to a number of Town officials, including police officers and Council members Waldron and Delaney. *Ellis Affidavit* ¶ 3 (Attachment A at 43). As a result, Goldberg contends, the defendants took a series of actions in retaliation. On September 4, 1987 he was removed as commander of the supernumeraries and the position was eliminated. On September 17, 1987 Goldberg wrote to the City Manager inquiring into obtaining benefits accorded Town employees working in excess of twenty hours per week. Four days later, on September 21, the Town Council voted to restrict supernumeraries to 19 hours per week unless authorization issued from the Town Manager. Goldberg asserts that he was the only supernumerary working more than twenty hours per week on average. On May 6, 1987, just four months earlier, the Council had voted to allow supernumeraries to average 24 hours per week up to a maximum of 40 hours in any one week. *Goldberg Affidavit* ¶¶ 8–9.

Goldberg further alleges that immediately following the June 15 meeting he became the subject of a series of memoranda, mostly authored by Town Manager Dana Whitman, which he characterizes as "harassing and demeaning." *Id.* ¶ 14.[3] In the memos the Town Manager repeatedly questions why Goldberg is referred to as "commander" of the supernumeraries after his removal from that position on September 4, 1987; reprimands Goldberg for working in plain clothes and in an unmarked vehicle; states that Goldberg should wear a silver rather than gold badge; instructs Chief Schnabel not to permit Goldberg to work on a volunteer basis; and criticizes Goldberg's habit of picking up police mail. *Id.* (Attachment B).

At a meeting on April 11, 1988, the Town Council voted to eliminate the position of supernumerary police officer altogether effective July 1, 1988. *Whitman Affidavit* ¶ 3 (Attachment B). Council members Delaney and Waldron voted against this measure, which passed by a 7–2 vote. *Id.*[4] As a result of eliminating the program the Town saved $24,430 in the 1988–89 fiscal year. *Id.* ¶ 8 (Attachment G). In the budget for the 1989–90 fiscal year, however, the Town found it "necessary to add $40,000 to the Overtime account to make up for the termination of the supernumarary force during the 1988–89 budget deliberations." *Goldberg Affidavit* ¶ 12 (Attachment A).

According to Chief Schnabel, some time after the vote Town Manager Whitman contacted a number of the former supernumeraries and offered to make them "Special Constables" pursuant to Conn.Gen. Stat. § 7–92. Goldberg received no such offer. *Schnabel Affidavit* ¶ 7. For example, Dolores Carotenuti, who as a supernumerary had been responsible for investigating sex crimes, was offered the designation of Sex Crimes Specialist with Constable Status. *Carotenuti Affidavit* ¶ 5. At oral argument plaintiff's counsel gave details of the provisions allegedly made for the other

---

**3.** Many of the memoranda Goldberg appends to his affidavit actually *predate* the entire incident involving Lt. Herbst, in some cases by more than one year.

**4.** Two of Goldberg's affidavits relate statements to the effect that the Town Council's sole motivation in eliminating the supernumerary program was to "get" Mr. Goldberg. *Schnabel Affidavit* ¶¶ 3–5; *Carotenuti Affidavit* ¶¶ 2–4. Rule 56(e), Fed.R.Civ.P. provides that affidavits on summary judgment "shall set forth such facts as would be admissible in evidence." These statements regarding the Council's motives are inadmissible because (1) the statements of Town Manager Whitman in the *Carotenuti Affidavit* are hearsay; and (2) the statements of Councilman Waldron in the *Schnabel Affidavit* are contrary to the rule, discussed *infra*, that the subjective motivations of legislators are not probative of a statute's constitutionality.

supernumeraries, but these allegations do not appear in any of the affidavits.

## II. *Discussion*

### A. *Standards for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered only when a review of the entire record demonstrates "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A dispute over a material fact exists if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The initial burden is on the moving party to establish that no relevant facts are in dispute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The burden then shifts to the nonmoving party "to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(e), Fed.R.Civ.P.).

In determining whether a genuine factual issue has been raised, the court's responsibility is not to resolve disputes between the parties but only to assess whether there are any factual issues to be tried. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). In so deciding, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). As long as the plaintiff adduces sufficient facts to substantiate the elements of his claim, summary judgment is inappropriate. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553.

In their memoranda the parties occasionally follow these standards but more often appear to be arguing a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P. The defendants, referring to Goldberg's complaint, argue for example that he has not "alleged a cause of action" under 42 U.S.C. § 1983. Whitman Memorandum, at 3. Goldberg responds that "[a] complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to the relief claimed." Plaintiff's Memorandum, at 2. Both parties, however, have submitted deposition testimony and affidavits in support of their respective positions. The court will rely on these materials, and not the allegations in the complaint, in determining whether a genuine issue exists for trial.

### B. *Elimination of the Supernumeraries*

#### 1. *Permissible Evidence of Legislative Purpose*

■ The linchpin of Goldberg's claim against the council defendants[5] is that in eliminating the position of supernumerary police officer they acted in retaliation for his public support of Chief Schnabel.[6] This action, he asserts, was intended to penalize him for exercising his right to free expression under the first amendment. The council defendants' primary argument on summary judgment is that the court cannot inquire into the motivation or purpose of legislators in determining the constitutionality of their enactments.[7] The defendants have filed a motion *in limine* seeking to exclude from the court's consideration all evidence of their "motives, thought pro-

---

5. Defendants Delaney, Doukas, Pacelia, Sacerdote, Senofonte, Tomassone, Unwin, Waldron and Zazzaro.

6. Q: Okay. So your lawsuit is based on your contention that the motivation of the town council in acting to eliminate the supernumeraries as part of the budget was a motive of retaliation, is that correct?

A: Correct.

*Goldberg Deposition*, at 64 (*Ellis Affidavit* ¶ 2, Attachment A).

7. In its prior ruling on the Defendants' Motion to Dismiss the court held that the Town Council acted in a legislative capacity in eliminating the budget for supernumeraries.

cesses or reasons for enacting a Town budget that eliminated funding for the supernumerary positions." Defendants' Motion in Limine, at 7. In the absence of such evidence, the court would be limited to reviewing the face of the Council's enactment and its effects in assessing whether it violated Mr. Goldberg's right to free expression.

■ Public employees who claim they were terminated in retaliation for exercising their first amendment rights must establish two facts in order to prevail: first, that their acts of speech were protected by the Free Speech Clause of the first amendment; and, second, that those acts of speech were a substantial or motivating factor in the defendants' decision to take action against them. *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 574–76, 50 L.Ed.2d 471 (1977); *Narumanchi v. Bd. of Trustees of Conn. State Univ.,* 850 F.2d 70, 73 (2d Cir.1988). Where the acts in question are taken by a legislative body, it would seem plain from the second element of this test that an inquiry into the motives or purpose of the individual legislators would be necessary. Indeed, the Supreme Court in *Mount Healthy* remanded the case to the district court to determine whether the defendant school board "would have reached the same decision as to the respondent's reemployment even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. at 576. In other words, a court must find that the plaintiff would have been rehired *but for* his acts of speech. *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). Certainly this test requires a full inquiry into *why* the defendants acted against the plaintiff.

Neither *Mt. Healthy* nor any of its Supreme Court progeny, however, involved challenges to statutes and, as a result, questions concerning the motives of legislators. In a long line of decisions the Court has expressed strong disfavor for inquiries into legislators' motives in enacting statutes, even where the statute is allegedly aimed at the content of the plaintiff's speech. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 268 n. 18, 97 S.Ct. 555, 565 n. 18, 50 L.Ed.2d 450 (1977) (questioning legislative motivation represents "substantial [judicial] intrusion into the workings of other branches of government"); *McCray v. United States,* 195 U.S. 27, 56, 24 S.Ct. 769, 776, 49 L.Ed. 78 (1904) ("[t]he decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted."); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29 (1986); *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 469–70, 101 S.Ct. 1200, 1204–05, 67 L.Ed.2d 437 (1981). As Chief Justice Warren elaborated in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968):

> It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive ... Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is an entirely different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

*Id.* at 383–84, 88 S.Ct. at 1682.

*Renton, supra,* is particularly instructive. The plaintiff, owner of two adult movie houses, challenged on first amendment grounds a municipal ordinance which prohibited adult movie theatres from locat-

ing within 1,000 feet of any residential zone, single or multiple family dwelling, church, park or school. 475 U.S. at 43, 106 S.Ct. at 926. The court of appeals held (in Justice Rehnquist's paraphrase) that "if 'a motivating factor' in enacting the ordinance was to restrict respondent's exercise of First Amendment rights the ordinance would be invalid ... no matter how small a part this motivating factor may have played in the City Council's decision." *Id.* at 47, 106 S.Ct. at 929. The Supreme Court found that "this view of the law was rejected in *O'Brien.*" *Id.* at 48, 106 S.Ct. at 929 [citation omitted]. To defeat a first amendment challenge, the court held, it is sufficient to show the city's "predominant intent" was to protect the quality of urban life and not to suppress the content of plaintiffs' speech. *Id.*

Following these decisions, a number of lower federal courts faced with free speech claims have refused to find that a legislator's improper motive creates a first amendment violation where the statute at issue is facially content neutral. *11126 Baltimore Blvd. v. Prince George's County, Md.,* 886 F.2d 1415, 1425–26 (4th Cir. 1989), *vacated on other grounds,* — U.S. ——, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990) (challenge to ordinance limiting adult book stores to specified commercial zones); *South Carolina Educ. Ass'n v. Campbell,* 883 F.2d 1251, 1257–1262 (4th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990) (challenge to statute permitting payroll deductions for charitable organizations but not labor unions); *F.O.P. Hobart Lodge No. 121 v. City of Hobart,* 864 F.2d 551, 554 (7th Cir.1988) (challenge to municipal ordinance enacted by lame duck city council allegedly in retaliation for police officers' support of councillors' successful opponents); *Walnut Properties, Inc. v. City of Whittier,* 808 F.2d 1331, 1334–35 (9th Cir.1986), *cert. denied,* — U.S. ——, 109 S.Ct. 1641, 104

L.Ed.2d 157 (1989) (challenge to statute forbidding adult theatre from locating within 1000 ft. of church); *In re G & A Books, Inc.,* 770 F.2d 288, 297 (2d Cir.1985), *cert. denied sub nom., M.J.M. Exhibiters, Inc. v. Stern,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986) (challenge by adult book store owners to municipal redevelopment project); *Hart Book Stores, Inc. v. Edmisten,* 612 F.2d 821, 829 (4th Cir.1979), *cert. denied,* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980) (challenge to statute prohibiting more than one adult theatre or bookstore in a single building).[8] *But see* Note, *Legislative Purpose and Federal Constitutional Adjudication,* **83 Harv.L. Rev. 1887, 1893 (1970)** (purpose of legislation should be considered as aid in determining whether its effects are constitutionally permissible).

As categorical as these holdings may seem, they must be viewed in tandem with other Supreme Court decisions which not only hold evidence of legislative purpose to be relevant to a constitutional inquiry but *require* that an unconstitutional purpose be shown as an essential element of a claim. As the Court stated in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), "[t]o the extent that [previous cases suggest] a generally applicable proposition that legislative purpose is irrelevant to constitutional adjudication, our prior cases ... are to the contrary." *Id.* at 244 n. 11, 96 S.Ct. at 2050 n. 11. Thus, in school desegregation cases the Court has held that "the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *Id.* at 240, 96 S.Ct. at 2048; *Keyes v. School Dist. No. 1 Denver, Colo.,* 413 U.S. 189, 208–209, 93 S.Ct. 2686, 2697–98, 37 L.Ed.2d 548 (1972); *Griffin v. County School Bd. of Prince Edward Island,* 377 U.S. 218, 231, 84 S.Ct. 1226, 1233, 12 L.Ed.2d 256 (1964).[9] In Es-

---

8. Courts have also refused to consider legislative motive or purpose in other areas of constitutional law. *See e.g. Brown v. Califano,* 627 F.2d 1221, 1234–35 (D.C.Cir.1980) (challenge to school desegregation regulations); *Cousins v. City Council of City of Chicago,* 466 F.2d 830, 856–57 (7th Cir.), *cert. denied,* 409 U.S. 893, 93

S.Ct. 85, 34 L.Ed.2d 151 (1972) (Stevens, J., dissenting) (challenge to political gerrymandering).

9. In *Griffin* the Court stated:
   [T]he record in the present case could not be clearer that Prince Edward's public schools

tablishment Clause cases, beginning with *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), the Court has asked "whether [the] government's actual purpose is to endorse or disapprove of religion." *See Board of Educ. v. Allen*, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968) ("[t]he test may be stated as follows: what are the purpose and primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power circumscribed by the Constitution"); *Wallace v. Jaffe*, 472 U.S. 38, 64, 105 S.Ct. 2479, 2494, 86 L.Ed.2d 29 (1985) (Powell, J., concurring) ("a law will not pass constitutional muster if the secular purpose articulated by the legislature is merely a 'sham'.") In equal protection challenges to zoning ordinances the Court has held that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Hts.*, 429 U.S. at 265, 97 S.Ct. at 563. In legislative redistricting cases, "multimember districts violate the Fourteenth Amendment if 'conceived or operated as purposeful devices to further racial discrimination,' " *Rogers v. Lodge*, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971)), and the Court requires that "the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *Washington v. Davis*, 426 U.S. at 240, 96 S.Ct. at 2048; *Wright v. Rockefeller*, 376 U.S. 52, 56, 84 S.Ct. 603, 605, 11 L.Ed.2d 512 (1964) (dismissing redistricting claim absent proof that the legislature "was either motivated by racial considerations or in fact drew the district on racial lines"); *Gomillion v. Lightfoot*, 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960) ("[a]cts generally lawful may become unlawful when done to accomplish an unlawful end") (quoting *United States v. Reading Co.*, 226 U.S. 324, 357, 33 S.Ct. 90, 98, 57 L.Ed. 243 (1912)). *See also Akins v. Texas*, 325 U.S. 398, 403–404, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692 (1945) (racial discrimination in selection of grand jurors proven by presence of a "purpose to discriminate").

In free speech cases such as this, these decisions appear to manifest a tension between the rigorous inquiry into content-based legislation mandated by the first amendment and the Court's reluctance to ascribe unconstitutional motives to a co-equal branch of government.[10] On the one hand, the Court has recognized that because regulatory statutes may serve as a vehicle for stifling speech on issues of public concern, a legislature's mere assertion of a benign purpose for its actions cannot be the end of a first amendment inquiry.[11]

were closed and private schools operated in their place with state and county assistance, for one reason, and one reason only: to ensure, through measures taken by the county and the State, that white and colored children in Prince Edward County would not, under any circumstances, go to the same school. Whatever nonracial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one, and grounds of race and opposition to desegregation do not qualify as constitutional. 377 U.S. at 231, 84 S.Ct. at 1233.

**10.** Some commentators suggest that any attempt to synthesize the Supreme Court seemingly contradictory holdings in this area would be a futile exercise. Ely, *Legislative and Administrative Motive in Constitutional Law*, **79 Yale L.J. 1205, 1208–1212 (1970)** (hereinafter "Ely"). For example, *Allen, supra,* holding that legislative purpose is an essential element of establishment clause claims was decided only two weeks after

Chief Justice Warren's categorical statement in *O'Brien, supra,* that improper motive will not invalidate an otherwise properly-enacted statute. *Allen* did not even cite to *O'Brien* in its discussion of legislative motive. Dean Ely has written:

If only logical tidiness hung in the balance, bemusement might be a satisfactory response to all this. But the rights of individuals are at stake. The Court should stop pretending it does not remember opinions on which the ink is barely dry and try to formulate principles for *deciding on what occasions and in what* ways the motivation of legislators or other government officials is relevant to constitutional issues.

Ely, at 1211–12.

**11.** "If, however, a city were to use a nuisance statute as a pretext for closing down a book store because it sold indecent books or because of the perceived secondary effects of having a

Where a regulation is based on the content of speech, "governmental action must be scrutinized more carefully to ensure that communication has not been prohibited 'merely because public officials disapprove the speakers' views.'" *Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980) (quoting *Niemotko v. Maryland*, 340 U.S. 268, 282, 71 S.Ct. 325, 333, 95 L.Ed. 267, 280 (1951) (Frankfurter, J., concurring)). On the other hand, to base a constitutional decision on what a legislature really meant is necessarily "a hazardous matter." *O'Brien*, 391 U.S. at 384, 88 S.Ct. at 1683. "Among the most telling objections to judicial review of legislative motive is the difficulty of ferreting out the real purpose of a collective lawmaking body, particularly if it must be inferred from the articulated remarks of a few legislators." L. Tribe, American Constitutional Law § 12–6 at 823 (2d ed. 1988) (hereinafter "Tribe"). *See Palmer v. Thompson*, 403 U.S. 217, 224–25, 91 S.Ct. 1940, 1944–45, 29 L.Ed.2d 438 (1971). Additionally, to strike down an otherwise valid law based on "improper" motives might simply invite legislators to repass the same legislation and fill the record with proclamations of a newly-found "proper" motive.[12]

The Court's response to this tension, more evident in the results of individual cases than in broad statements of doctrine, has been to recognize the inevitability of examining legislative motive but to attempt to do so in a manner which is "deferential and limited."[13] *Wallace*, 472 U.S. at 74, 105 S.Ct. at 2499 (O'Connor, J., concurring); *see also id.* ("a court has no license to

[12]. In *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), Justice Rehnquist, dissenting, argued that the "secular purpose" test in Establishment Clause cases "will condemn nothing so long as the legislature utters a secular purpose and says nothing about aiding religion. Thus the constitutionality of a statute may depend upon what the legislators put into the legislative history, and, more importantly, what they leave out." *Id.* at 108, 105 S.Ct. at 2516.

[13]. The defendants place great emphasis on the Supreme Court's 1885 decision in *Soon Hing v. Crowley*, 113 U.S. 703, 5 S.Ct. 730, 28 L.Ed. 1145 (1885), which contains the following language:

And the rule is general with reference to the enactments of all legislative bodies that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the facet of the acts, or inferrible from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments. The motives, considered as the moral inducements for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the

purveyor of such books in the neighborhood, the case would clearly implicate First Amendment concerns and require analysis under the appropriate First Amendment standard." *Arcara v. Cloud Books*, 478 U.S. 697, 708, 106 S.Ct. 3172, 3178, 92 L.Ed.2d 568 (1986) (O'Connor, J., concurring).

impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile. *Id.* at 710–11, 5 S.Ct. at 734. Contrary to the defendants' view, *Soon Hing* does not support a blanket prohibition against inquiries into legislative purpose. First, as the quotation above makes clear, *Soon Hing* itself would permit a consideration of legislative purpose to the extent it is "inferrible" from a statute's operation, the "condition of the country" and the like. This sort of evidence is equivalent to the objective evidence discussed in the text and which will be the only evidence considered in this case.

Second, it is doubtful that *Soon Hing* is still good law. The case involved an equal protection challenge to a San Francisco municipal ordinance regulating the hours of operation for public laundries. *Id.* at 710, 5 S.Ct. at 734. The petitioner alleged that the ordinance had been passed to harass and drive away the persons of Chinese origin who dominated the laundry business. *Id.* The court held that even if a discriminatory motive for the ordinance were proven, it would not violate the equal protection clause "unless in its enforcement it is made to operate against the class mentioned." *Id.* at 711, 5 S.Ct. at 734. Modern equal protection jurisprudence provides exactly the opposite: disproportionate impact is one consideration but "[p]roof of racially discriminating intent or purpose is *required* to show a violation of the Equal Protection Clause." *Arlington Hts.*, 429 U.S. at 265, 97 S.Ct. at 563. *See Washington v. Davis*, 426 U.S. at 240, 96 S.Ct. at 2048 (declaring "the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose"); *Tribe, supra*, § 16–20 at 1509.

psychoanalyze the legislators.") A number of cases suggest that an inquiry into legislative purpose is properly circumscribed where a court considers only *objective* evidence of intent. Justice O'Connor stated in her *Wallace* concurrence, a case challenging a moment of silence law for schools, "[t]he relevant issue is whether an *objective observer*, acquainted with the test, legislative history, and implementation of the statute would perceive it as a state endorsement of religion in the schools." *Id.* at 76, 105 S.Ct. at 2500. Similarly, in *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), a sex discrimination case, the court noted that "[p]roof of discriminatory intent must necessarily usually rely on *objective* factors ... What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid. Often it is made clear from what has been called, in a different context, 'the give and take of the situation.'" *Id.* at 279 n. 24, 99 S.Ct. at 2296 n. 24 [emphasis added] (quoting *Cramer v. United States*, 325 U.S. 1, 32–33, 65 S.Ct. 918, 933–34, 89 L.Ed. 1441 (1944)). Professor Tribe has succinctly summarized this process:

> In the free speech context, the concept of illegitimately motivated laws or other government activities should be limited to those whose *social meaning* renders the abridgements of speech. The Court should accordingly treat as facially discriminatory ... any evident patterns of official action that a reasonably well-informed observer would interpret as suppressing a particular point of view. Such a restriction on speech should not be subject to validation either by a mask of surface neutrality or by the possibility of hypothesizing permissible motives or 'secret hopes.'

Tribe § 12–5 at 820–21 [emphasis in original].

Such an objective inquiry would normally preclude testimony by individual legislators as to what they intended when they cast their votes.[14] *City of Las Vegas v. Foley*, 747 F.2d 1294, 1299 (9th Cir.1984); *May v. Cooperman*, 572 F.Supp. 1561, 1564 n. 2 (D.N.J.1983). However, a court *would* be permitted to examine such evidence as a clearly disparate impact of legislation, unexplainable on any grounds other than unconstitutional motive, *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564; a statute's effect which is clearly unrelated to its stated purpose, *Ebel v. City of Corona*, 698 F.2d 390, 393 (9th Cir.1983); highly unusual procedures surrounding enactment and enforcement of the legislation, *Tovar v. Billmeyer*, 721 F.2d 1260, 1264–65 (9th Cir.1983), *cert. denied*, 469 U.S. 872, 105 S.Ct. 223, 83 L.Ed.2d 152 (1984); a pattern of discriminatory or censorious behavior manifested in past practice, *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 804–805, 105 S.Ct. 3439, 3450, 87 L.Ed.2d 567 (1985); and whether the plaintiff is the sole target of the legislation. *Vandenplas v. City of Muskego*, 753 F.2d 555, 560 (7th Cir.), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985).

For example, in *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), the Supreme Court struck down a Louisiana license tax of two percent on all newspapers in the state whose circulation exceeded 20,000 per week, of which there were thirteen (out of 120). *Id.* at 240–41, 56 S.Ct. at 445. The court relied solely on objective evidence of intent in concluding that the tax was aimed at the content of the newspapers:

> The tax here involved is bad not because it takes money from the pockets of the appellees. If that were all, a wholly different question would be presented. It is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled by virtue of the constitutional guarantees ... The form in which the tax is imposed is in itself suspi-

---

14. "In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege." *Arlington Heights*, 429 U.S. at 268, 97 S.Ct. at 565.

cious. It is not measured or limited by the volume of advertisements. It is measured alone by the extent of the circulation of the publication in which the advertisements are carried, with the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers.

*Id.* at 250, 251, 56 S.Ct. at 449.

Returning to this case and the requirement in *Mt. Healthy* that the plaintiff's acts of speech be a substantial or motivating factor in the defendants' decision to take action, 429 U.S. at 287, 97 S.Ct. at 576, the court concludes that this criterion is not altered by the fact that the defendants are legislators. In meeting this prong of the *Mt. Healthy* test, however, Goldberg may rely only on objective evidence of the legislators' motivations.

### 2. Objective Evidence of the Councilors' Motivation

■ Using an objective test and relying only on the facts Goldberg has adduced in opposition to the defendants' motion, a reasonable jury could conclude that the Town Council's vote to eliminate the supernumeraries was motivated by a desire to retaliate against Goldberg for his support of Chief Schnabel. This holding does not apply to defendants Waldron and Delaney who voted against eliminating the supernumarary program. *Whitman Affidavit* ¶ 3 (Attachment B, at 19). Since they did not participate in the act alleged to have violated Goldberg's first amendment rights, the court grants summary judgment in their favor.

As to the other council defendants, however, the following evidence is probative of their intent. Prior to the controversy surrounding Lt. Herbst, Goldberg had enjoyed modest success and an amicable working relationship with other Town officials: he was the unofficial commander of the super-

numeraries; had been named Officer of the Year in 1984; received a higher rate of pay than his fellow supernumeraries; received funds to pursue training out-of-state; and, perhaps most telling of all, earned the praise of Town Manager Whitman for having done "an outstanding job" and for his "interest and dedication."

All of this changed suddenly after Goldberg made known to fellow police officers and to two Councilmen his support for Chief Schnabel. It is evident from the minutes of the June 15, 1987 Council Meeting that the Chief's decision not to discipline Lt. Herbst was highly unpopular. Councilmen made critical comments about Lt. Herbst being an attorney and having acted based on legal rather than police judgment (minutes, at 15); expressed concern that "people are saying Rocky Hill is a racist town" (*id.*); stated that the Chief "works for the Town under the Town Manager and he works for us and when it comes to policy it will be loud and clear that they [sic] want answers" (*id.* at 12); and stated that "an apology is due the Town and the members of the Council for Lieutenant Herbst's remarks about the Town being racist" (*id.* at 20). Rocky Hill residents at the meeting stated, among other things, that the incident represented the "complete bungling of a police call from start to finish" and that "everyone here believes the officer should have been disciplined" (*id.* at 16).

■ Within three months of this meeting Goldberg had been removed as commander of the supernumeraries and subjected to a stream of memoranda from Town Manager Whitman that a reasonable jury might take to be so annoying and nitpicking as to have been motivated by a desire to harass Mr. Goldberg.[15] Shortly thereafter the Council reversed its own decision of four months prior and limited the Supernumeraries to 19

---

15. While the Council defendants did not issue these memoranda, they may properly be considered as providing a context for Council's decision to eliminate the supernumeraries. *See Grosjean,* 297 U.S. at 250, 56 S.Ct. at 449 (statute violates first amendment when considered "in light of its history and of its present setting"). Moreover, at least one of the memoranda de-

scribes communications between a councilman and the Town Manager concerning Goldberg. *Goldberg Affidavit* (Attachment B–25, B–26). Additionally, many of Whitman's memoranda to Schnabel, copied to Goldberg, are phrased in the first person plural (i.e. "we" are concerned). Who "we" are remains an unresolved issue of fact.

hours per week. The defendants do not dispute that Goldberg was the only supernumarary regularly working an average of 20 hours or more per week. They also do not dispute that this cutback in hours came only four days after Goldberg requested benefits due Town employees who average over 20 hours per week. *See Goldberg Affidavit* ¶ 14 (Attachments B–19 and 22). Soon after the Council voted to eliminate the supernumarary program some or all of the other officers were offered special constable positions. Goldberg was conspicuously absent from this group. Finally, to the extent the stated purpose of eliminating the supernumeraries was to save the Town money, it is a relevant fact that the Town ended up spending approximately $20,000 *more* that the entire supernumerary budget, on regular police overtime to make up for the loss in manpower. Taking this evidence collectively, a reasonable jury could find that Goldberg's acts of speech were a substantial or motivating factor in the actions taken against him.

### 3. *Protected Nature of Plaintiff's Speech*

■ The first prong of the *Mt. Healthy* test requires that plaintiff's acts of speech be protected by the first amendment. To determine whether a public employee's first amendment rights have been violated, a court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Giacalone v. Abrams*, 850 F.2d 79, 85 (2d Cir.1988). The threshold issue is whether the employee's expression constitutes speech on a matter of public concern. *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). If it does, the court must then weigh the competing concerns of "whether the speech impaired the employee's ability to perform his duties, disrupted working relationships requiring personal loyalty and confidence, or otherwise impeded the regular operation of the employing agency." *Rookard v. Health and Hosp. Corp.*, 710 F.2d 41, 46 (2d Cir.1983).

The minutes of the June 15, 1987 Town Council meeting, at which many of the defendants expressed their views on Lt. Herbst's actions, make abundantly clear that those acts were of great concern to the elected officials and residents of Rocky Hill. Many of the speakers expressed concern that the issue was receiving prominent play in newspapers such as the Hartford Courant. Minutes at 8, 10, 11 and 15. The minutes report Councilman Sacerdote stating that "he resents it very deeply that people are saying Rocky Hill is a racist town." *Id.* at 10. Chief Schnabel's comment that his officers would not have had probable cause to stop two men because they were described simply as "suspicious" and "Puerto Rican" prompted a lengthy debate among the councilman and citizens as to how and when Rocky Hill police ought to respond to such calls. In sum, by supporting the Chief's decision not to discipline Lt. Herbst, Goldberg did not speak out "upon matters only of personal interest" such as office discipline and morale, *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 but rather upon an issue of substantial import to the residents of Rocky Hill.

As for the competing concerns of government efficiency, there is no evidence in the record (nor do the defendants argue) that Goldberg's speech compromised his ability to perform his duties as supernumarary.

Alternatively, the defendants argue that Chief Schnabel's statements which Goldberg supported were simply false and as such are not accorded protection under the first amendment. Whatever the merits of the argument concerning the Chief's speech, it is not at issue here. Rather, the speech in question is *Goldberg's* expression of support for the Chief's actions towards Lt. Herbst. That speech was neither "true" nor "false" but an expression of opinion on a local political controversy. "Speech on public issues occupies the 'highest rung of the hierarchy of First amendment values,' and is entitled to special pro-

tection." *Connick*, 461 U.S. at 145, 103 S.Ct. at 1689 (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982)). Accordingly, the court holds that Goldberg's speech merits first amendment protection.

### C. *Actions of Town Manager*

■ Because only the Town Council voted to eliminate the supernumeraries, Town Manager Whitman cannot be held liable for that action. But an employee's first amendment rights may still be infringed by governmental action short of termination. "A public official cannot withhold a substantial benefit from an employee because of activities protected by the first amendment without affecting the employee's freedom or expression. This is true whether that benefit is economic, such as a higher salary, or some other condition of employment, such as location or job assignment." *Manhattan Beach Police Officers Ass'n, Inc. v. City of Manhattan Beach*, 881 F.2d 816, 818–19 (9th Cir.1989). The second circuit adopted this view in *Lieberman v. Reisman*, 857 F.2d 896, 900 (2d Cir.1988), in which it held that a town employee who claimed she had been harassed because of her political affiliation stated a claim for violation of the first amendment. *See also Agosto–de–Feliciano v. Aponte–Roque*, 889 F.2d 1209, 1214–18 (1st Cir. 1989); *Bennis v. Gable*, 823 F.2d 723, 731 & n. 9 (3rd Cir.1987); *Messer v. Curci*, 881 F.2d 219, 224 (6th Cir.1989), *vacated on other grounds*, —— U.S. ——, 110 S.Ct. 3233, 111 L.Ed.2d 745; *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir.1989). These decisions are simply specific applications of the general principle that courts will invalidate "statutes and actions [which have] sought to suppress the rights of public employees to participate in public affairs." *Connick*, 461 U.S. at 144, 103 S.Ct. at 1689.

The court finds that a factual dispute exists as to whether the actions Whitman took directly against Goldberg—the termination of his "commander" status and the sending of critical memoranda—were motivated by a desire to retaliate against Goldberg for his acts of speech. Whitman argues that the memoranda were not harassing or demeaning and thus did not "punish" Goldberg in any way for his speech. This argument, however, is simply Whitman's subjective interpretation of the memoranda. Where documents are ambiguous and may reasonably be interpreted as having more than one meaning, a factual dispute exists and summary judgment is inappropriate. *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1979). The memos could be read either as routine critical comments or as overkill amounting to and intended as harassment. The choice between these two alternatives must be left to the jury.

### Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is denied except as to defendants Waldron and Delaney as to whom it is granted. The motion *in limine* is denied to the extent consistent with this opinion and the motion to strike is granted to the extent consistent with this opinion.

SO ORDERED.

## ON MOTION FOR RECONSIDERATION

This is a motion for reconsideration of the court's July 23, 1990 ruling denying summary judgment for all defendants except Waldron and Delaney (hereinafter "Summary Judgment Ruling"). The court found genuine issues of fact to exist as to whether the council defendants were "substantially motivated" to terminate plaintiff Kenneth D. Goldberg by his having engaged in protected speech. Familiarity with the Summary Judgment Ruling is assumed. The remaining defendants now move for reconsideration, arguing that Goldberg failed to produce any admissible evidence that they knew of his protected speech prior to the termination.

■ The defendants' argument must be viewed in the context of the shifting burdens applicable to motions for summary judgment. As the court stated in the Summary Judgment Ruling: "The initial bur-

den is on the moving party to establish that no relevant facts are in dispute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 [90 S.Ct. 1598, 1608], 26 L.Ed.2d 142 (1970). The burden then shifts to the nonmoving party 'to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." ' *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(e), Fed.R.Civ.P.)" The moving party need not support its motion with affidavits or other similar materials negating the claims of the non-moving party. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. Rather, it is sufficient for the moving party to point out that the claims upon which it seeks summary judgment are without factual support. *Id.* at 325, 106 S.Ct. at 2553.

The defendants now argue that the court did not consider the question of whether they were aware of Goldberg's support for Chief Schnabel. They assert, correctly in the court's view, that Goldberg's support for the Chief could not have been a "substantial motivating factor" in their actions if they were not aware of that support in the first place. Under the standards set forth above, it would be the defendants' initial burden to point out a lack of factual support for any such knowledge. The burden would then shift to Goldberg to allege facts, through affidavits or other material specified in Rule 56(e), showing that the defendants *did* know Goldberg supported the Chief.

Town Manager Whitman amply fulfilled his initial burden by filing an affidavit stating that he did not know of Goldberg's support for the Chief.[1] Goldberg's response to this claim is unclear since his Statement of Material Facts in Dispute (Docket No. 46) does not speak directly to Whitman's knowledge of his public position. Goldberg also does not address this argument in opposing the motion for reconsideration.[2] The only Rule 56(e) material which arguably creates a disputed issue of fact as to Whitman's knowledge is the affidavit of Delores M. Carotenuti, one of Goldberg's fellow supernumeraries. Ms. Carotenuti states that in April or May 1988 she went to see Whitman to ask why the supernumerary program was being eliminated. "Mr. Whitman told me it was not him, it was the Council. He said the Town Council was doing it to get Ken Goldberg. The Town Council is after Ken Goldberg, not me or the other Supernumeraries. The Manager told me its like we have to throw the baby away with the bath water." *Carotenuti Affidavit* (Docket No. 50) ¶ 3.[3]

There are, however, two problems with using this statement to create a disputed issue of fact. First, Ms. Carotenuti does not explicitly say the Council was "after" Goldberg because of his support for the Chief; it could just as well have been for some other reason. Second, she relates nothing about *Whitman's* knowledge as opposed to that of the Councilmen. The question is whether, despite these problems, the affidavit contains sufficient information to dispute the claims in Whitman's affidavit. Although a party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v.*

1. Whitman's affidavit states:

    Plaintiff never indicated to me, nor have I seen or heard any statements by him, that he supported the Chief of Police, that he agreed with 'the public position taken by the Chief of Police,' that he defended the decisions and actions of the Chief of Police or that he felt Town Officials were wrong to criticize the Chief of Police concerning his handling of the Citizen's Complaint concerning the Lieutenant's recalling of the police cruiser on April 7, 1987. Also, plaintiff never expressed those views to the Town Council at any Council meeting.

*Whitman Affidavit* (Docket No. 29) ¶ 23.

2. In its entirety, Goldberg's response to the motion for reconsideration is as follows: "The plaintiff hereby objects to the Defendant's Motion for Reconsideration for the reason that the matters have been thoroughly argued and briefed by counsel and thoroughly considered by the Court."

3. This statement would be admissible as an admission by Whitman. Fed.R.Evid. 801(d)(2).

U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987), a court is obligated to draw all reasonable inferences in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). While admittedly a close call, to conclude from Ms. Carotenuti's affidavit that Whitman knew of Goldberg's position is more inference than speculation. From the evidence in the record it is clear that the incident involving Lt. Herbst was big news in Rocky Hill politics. It is equally evident from his stream of critical memoranda that Whitman was aware of the most minute aspects of Goldberg's actions as supernumerary. Additionally, the court has already found a reasonable dispute as to whether the Council defendants acted against Goldberg because of his support for the Chief. From these background facts a reasonable jury might infer from Whitman's statements, as related by Ms. Carotenuti, that he knew Goldberg's dispute with the Council derived from his support for the Chief. Accordingly, the court finds that Goldberg has met his burden of establishing a factual dispute on the issue of Whitman's knowledge.

■ The standard for judging the council defendants' knowledge is more problematic. Direct testimony by the councilmen is barred as inadmissible evidence of their subjective intent. Similarly, even if other witnesses' second-hand accounts of what the councilmen said were not deemed inadmissible hearsay, those statements would still relay the subjective views of the councilmen themselves and would be inadmissible on that basis. Goldberg thus appears to face a Catch–22. His attempts to prove

legislators' knowledge by their own statements will be barred by the rule against subjective evidence of intent, but a failure to prove knowledge will invite summary judgment for lack of causation.[4]

The council defendants take the position that this dilemma is insoluble and, as a result, that Goldberg cannot fulfill his burden. This argument, however, focuses too narrowly on the inadmissibility of direct testimony by the council defendants themselves. It ignores the substantial body of *circumstantial* evidence upon which the court found a factual dispute as to the council's motivation for eliminating the supernumeraries. *See* Summary Judgment Ruling at 21–24. From this evidence, especially that showing the dramatic change in relations between Goldberg and the Council after the incident involving Lt. Herbst, a jury could reasonably infer that the council defendants knew of Goldberg's position. Because such inferences of knowledge are inherently subjective, "summary judgment is rarely appropriate where the moving party's state of mind is a material issue." *E.E.O.C. v. Home Ins. Co.,* 672 F.2d 252, 257 (2d Cir.1982); *see also* 10A C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2730 at 238 (2d ed.1983) ("[i]nasmuch as a determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ—a function traditionally left to the jury—summary judgment often will be an inappropriate means of resolving an issue of this character.")

Accordingly, in order to meet his burden of identifying disputed issues of fact,

---

**4.** Even if direct evidence of knowledge were permitted as a matter of substantive law, Goldberg's evidence would be inadmissible on other grounds. Whitman's statements in the Carotenuti affidavit, while admissible against him as his own admissions, are not admissible against the council defendants as *their* admissions absent a showing (not made here) that he was authorized to speak on their behalf. Fed.R. Evid. 801(d)(2). The affidavit of Chief Schnabel (Docket No. 49) relates only statements of Councilman Waldron and not the views of the other councilmen. Because Waldron voted *against*

eliminating the supernumeraries it is not reasonable to impute his statements to other council defendants who voted *for* the resolution. *O'Neal v. Esty,* 637 F.2d 846, 851 (2d Cir.1980), *cert. denied sub nom., Esty v. O'Neal,* 451 U.S. 972, 101 S.Ct. 2050, 68 L.Ed.2d 351 (1981). Finally, Goldberg states in his deposition that "I was told by other officers that they were told by council members that I was supporting the chief's position." *Goldberg Deposition* at 61 (*Ellis Affidavit* (Docket No. 57) ¶ 3, Exhibit A). The statements of the officers to Goldberg are inadmissible hearsay.

Goldberg need not adduce direct evidence of the councilors' knowledge. The circumstances surrounding elimination of the supernumeraries are such that an inference of knowledge could reasonably be drawn. Consequently, summary judgment is inappropriate. *Schmidt v. McKay*, 555 F.2d 30, 37 (2d Cir.1977) (where an inquiry "necessarily involves a dispute concerning state of mind and conflicting interpretations of perceived events, summary judgment is ordinarily not a proper vehicle for the resolution of such a dispute.")

### Conclusion

For the foregoing reasons, the motion for reconsideration is granted and after reconsideration the court declines to depart from its ruling of July 23, 1990.

SO ORDERED.