**Rabbi Abraham GROSSBAUM
and Lubavitch of Indiana,
Inc., Plaintiffs,**

v.

**INDIANAPOLIS–MARION COUNTY
BUILDING AUTHORITY and Ronald L.
Reinking, in his capacity as General
Manager, Defendants.**

No. IP 94–1801–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 15, 1995.

B. Keith Shake, Henderson, Daily, Withrow & DeVoe, Indianapolis, Indiana, Nathan Lewin, Niki Kuckes, David S. Cohen, Miller, Cassidy, Larroca & Lewin, Washington, DC, for plaintiffs.

Thomas J. Costakis, Krieg, Devault, Alexander & Capehart, Indianapolis, Indiana, for defendants.

## MEMORANDUM OPINION ON PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION

HAMILTON, District Judge.

On October 2, 1995, defendant Indianapolis–Marion County Building Authority ("Building Authority") revised one of its rules so as to prohibit all private uses of the lobby of the City–County Building in downtown Indianapolis. Plaintiffs Rabbi Abraham Grossbaum and Lubavitch of Indiana, Inc. wish to display a five-feet tall wooden menorah in the lobby, as they have done in the past. Plaintiffs agree that the Building Authority's new policy is facially constitutional because it is viewpoint-neutral. They also agree that the Building Authority has the right to close what had been a "nonpublic forum." The new policy therefore does not suffer from the First Amendment defect found by the Court of Appeals in an earlier policy that banned displays of seasonal religious symbols. See *Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 63 F.3d 581 (7th Cir.1995).

However, the new facially neutral policy still does not let plaintiffs do what they want to do: display their menorah in the lobby of the City–County Building. Plaintiffs have filed an amended complaint and a new motion for preliminary injunction. They assert that even though the new policy is facially neutral and closes the forum to all private uses, it still violates plaintiffs' First Amendment rights solely because the Building Authority acted with improper motives when it approved the new policy. Specifically, plaintiffs contend the Building Authority acted with one or more of the following unconstitutional motives when it closed the forum to everyone: (1) a desire to retaliate against these plaintiffs for suing the defendants in this action; (2) a desire to retaliate against these plaintiffs for their religious expression; and (3) an intent to discriminate against these plaintiffs' religious beliefs in particular and/or religion in general. The parties have quickly compiled and presented a substantial volume of evidence concerning the reasons for the Building Authority's decision. That volume of evidence and the speed with which it must be analyzed account for much of the length of this opinion. Despite that length, the court's decision ultimately turns on a factual determination about the Building Authority's motives in adopting the facially constitutional policy. On the existing record, the court finds that the defendants did not act with any improper motive when they decided to "close" the forum by prohibiting all private displays in the common areas of the building. Because plaintiffs have not shown they are reasonably likely to succeed on the merits of their claims, the court denies plaintiffs' motion for a preliminary injunction.

## I. Background

Plaintiff Rabbi Abraham Grossbaum is an Orthodox Jewish rabbi affiliated with the Lubavitch Hasidic movement. He is a resident of Indianapolis. He is also the Executive

Vice President of plaintiff Lubavitch of Indiana, Inc., which is a private, non-profit Orthodox Jewish organization incorporated under the laws of Indiana. Defendant Indianapolis–Marion County Building Authority is a municipal corporation organized under the laws of Indiana. The Building Authority is responsible for managing the City–County Building in downtown Indianapolis which houses a number of city and county agencies of government and some private tenants. Defendant Ronald L. Reinking is the general manager of the Building Authority. He administers the rules and regulations of the Building Authority and is responsible for granting or denying requests to use the lobby of the City–County Building for displays.

From 1985 through 1992, plaintiffs requested and received permission from the Building Authority to display their five-feet tall menorah in the lobby of the City–County Building during Chanukah.[1] In 1992 the Indiana Civil Liberties Union and the Jewish Community Relations Council questioned the display of the menorah in a public building like the City–County Building. In October 1993, the Building Authority adopted a new "Policy on Seasonal Displays" which prohibited displays of seasonal religious symbols in the lobby and other common areas of the building. Pursuant to that policy, plaintiffs were not permitted to display their menorah in 1993.

Before Chanukah in 1994, plaintiffs filed this action and sought a preliminary injunction against enforcement of the Policy on Seasonal Displays. Plaintiffs argued that the policy banned only seasonal *religious* displays, which amounted to viewpoint discrimination concerning expression in the forum on the subject of "the holiday season." See *Lamb's Chapel v. Center Moriches Union Free School Dist.,* —— U.S. ——, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). On November 22, 1994, this court denied plaintiffs' motion for a preliminary injunction. *Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 870 F.Supp. 1450 (S.D.Ind.1994). On November 29, 1994, the Court of Appeals issued an injunction pending appeal that enjoined enforcement of the Policy on Seasonal Displays. The Building Authority therefore permitted plaintiffs to display their menorah in the lobby of the City–County Building. Several other individuals and groups also applied for and received permission from the Building Authority to place religious displays in the lobby of the City–County Building. On August 15, 1995, the Court of Appeals reversed this court's decision and held that the Building Authority's Policy on Seasonal Displays subjected plaintiffs to unconstitutional viewpoint discrimination. *Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 63 F.3d 581 (7th Cir.1995).

With that background, we come to the more recent events at issue today. On August 28, 1995, Rabbi Grossbaum requested permission from the Building Authority to place a menorah display in the lobby of the City–County Building during Chanukah in 1995. The Building Authority board of directors met on September 5, 1995, and discussed the possibility of amending the rules that govern access to the common areas of the City–County Building for display purposes. On October 2, 1995, the board met in executive session to discuss the present litigation. After the executive session, the board met in a public session and amended the rules governing use of the common areas in the building. The board voted to: (a) amend its "Rule 13" to prohibit all private displays in the common areas, including the lobby; (b) modify slightly the rule prohibiting political uses of the building; and (c) rescind the Policy on Seasonal Displays that the Court of Appeals had held unconstitutional. Relying on the amended Rule 13, Mr. Reinking wrote to Rabbi Grossbaum the next day denying his request to erect the menorah display in the lobby in 1995.

Plaintiffs then investigated the new rule and took depositions of Mr. Reinking, his assistant, and all five members of the Building Authority board. On November 29, 1995, plaintiffs filed an amended complaint and a second motion for preliminary injunction, this

---

1. A menorah is a nine-pronged candelabrum that is displayed during the eight days of Chanukah and is lit each night of the festival. It is a religious symbol associated with the Jewish holiday.

time seeking an injunction against enforcement of the new Rule 13 prohibition on all private displays in the lobby and other common areas. Plaintiffs do not challenge the *facial* constitutionality of the prohibition. Instead, they claim the new policy is unconstitutional because the Building Authority adopted it for one or more of three unconstitutional purposes: (1) to retaliate against plaintiffs for having sued the Building Authority; (2) to retaliate against plaintiffs for exercising their free speech rights by displaying the menorah; and/or (3) to discriminate against either plaintiffs' viewpoint or all religious viewpoints toward the holiday season. Chanukah begins at sundown on Sunday, December 17, 1995. The parties have submitted briefs, documentary exhibits, and extensive passages from depositions. At a hearing on December 11, 1995, both sides presented oral argument. This opinion states the court's findings of fact and conclusions of law for purposes of Fed.R.Civ.P. 65 and 52.

## II. Preliminary Injunction Standard

■ Before the court may enter a preliminary injunction, the plaintiff must demonstrate "(1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992). If those elements are not satisfied, then the inquiry is over and the preliminary injunction must be denied. If those elements are met, the court then proceeds to consider "(3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Abbott Labs.*, 971 F.2d at 11–12. Accord, *e.g.*, *Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir.1994); *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir.1986).

■ There is no precise standard for the quantum of evidence required to obtain a preliminary injunction. Rather, the strength of the evidence and the potential harms involved are factors balanced on what the Seventh Circuit has called a discretionary sliding scale:

> The [district] court, sitting as would a chancellor in equity, ... "weighs" all four factors in deciding whether to grant the injunction, seeking at all times to "minimize the costs of being mistaken." We call this process the "sliding scale" approach: the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side. This weighing process, as noted, also takes into consideration the consequences to the public interest of granting or denying preliminary relief. While we have at times framed the sliding scale approach in mathematical terms, it is more properly characterized as subjective and intuitive, one which permits district courts to "weigh the competing considerations and mold appropriate relief."

*Abbott Labs.*, 971 F.2d at 12 (citations and footnote omitted). Accord, *Vencor*, 33 F.3d at 845; *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir.1994). See also 11A Wright, Miller & Kane, Federal Practice & Procedure § 2948.3, at 189–97 (1995).

## III. Likelihood of Success on the Merits

■ The parties agree that the Building Authority's new Rule 13 is facially neutral. By stipulating for purposes of the plaintiffs' motion for preliminary injunction that the building lobby is a "nonpublic forum," the parties also agree that the First Amendment permits the Building Authority to exclude all private displays using such a facially neutral standard. See *Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985) (government may limit access to nonpublic forum to particular class of speakers); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 49, 103 S.Ct. 948, 955, 957, 74 L.Ed.2d 794 (1983) (government may restrict access to nonpublic forum based on identity of speaker). However, even facially neutral policies may violate the First Amendment if they are adopted for an unconstitu-

tional purpose, including retaliation against a person for engaging in constitutionally protected conduct, *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977), or a desire to suppress speech expressing a particular viewpoint or group of viewpoints, *Cornelius,* 473 U.S. at 812, 105 S.Ct. at 3454. Plaintiffs therefore attempt to show that the new Rule 13 is unconstitutional because the Building Authority had an unconstitutional motive in adopting the new rule. The court's detailed factual findings may be more intelligible if the law governing those claims is set out first.

### A. Retaliation Standard

■ Plaintiffs assert two different theories of retaliation. They claim that the Building Authority amended Rule 13 to retaliate for their filing of this lawsuit and/or to retaliate for their exercise of free speech rights. Plaintiffs are careful to distinguish between retaliation *for the lawsuit* and retaliation *against their speech rights* several times in their amended complaint and brief. Citizens have a right under the First Amendment to petition their governments for a redress of grievances by, among other things, filing lawsuits. If a government tries to punish a person for exercising that constitutional right, the person may assert a claim for retaliation, as plaintiffs have done here. See *Harris v. Fleming,* 839 F.2d 1232, 1238 (7th Cir.1988) (collecting other Seventh Circuit cases on constitutional right of access to the courts). See generally *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. at 283–84, 97 S.Ct. at 574–75 (retaliation against constitutionally protected activity is actionable); *Rakovich v. Wade,* 850 F.2d 1180, 1189 (7th Cir.1988) (*en banc* ) (same). The constitutional right on which plaintiffs rely in making their other claim of retaliation is their past and future free speech right to display the menorah. Although both of these theories can be called "retaliation," plaintiffs point out that they are conceptually distinct.

■ To prevail on their claim of retaliation for asserting free speech rights, plaintiffs must show that defendants acted out of hostility to plaintiffs' speech—that is, the expressive content of the menorah. On this theory, plaintiffs must show that the defendants acted based on hostility toward religion in general or toward plaintiffs' faith in particular. The proof necessary for plaintiffs' Free Speech theory of retaliation is the same proof needed to establish their viewpoint discrimination claim under the Free Speech Clause. In claiming viewpoint discrimination, plaintiffs allege that the defendants' ban on all private displays in the City–County Building was motivated by a subjective hostility toward religion in general or plaintiffs' faith in particular. Since both the retaliation claim and the viewpoint discrimination claim under the free speech theory are based on the same proof and require no analytically distinct treatment, the court will evaluate both of those claims in terms of viewpoint discrimination.

On their claim of retaliation for filing the lawsuit, plaintiffs argue that this court, as finder of fact, may infer that the defendants harbored the impermissible motive—revenge over the lawsuit—if it finds that the defendants amended Rule 13 "in response" to the lawsuit which resulted in the Seventh Circuit decision adverse to the defendants. Plaintiffs point out correctly that they need not produce direct evidence of an intent to retaliate. That intent may be inferred from circumstantial evidence, including what plaintiffs say is a suspicious chronology of events. However, plaintiffs also go a step farther and argue that the court need not find that defendants were hostile toward plaintiffs. They contend that so long as the court finds that the defendants acted "in response" to the constitutionally protected activity—the lawsuit—and that the lawsuit was a "but for" cause of the defendants' action, the court may (and perhaps must) find retaliation.

Plaintiffs' approach to "retaliation" obscures a critical distinction in this case. "Retaliation" is not the legal or linguistic equivalent of "response." The distinction is between a losing litigant who is angry or hostile toward the prevailing party—who wants to "get even" for the lawsuit—and a losing litigant who considers several options for correcting the underlying violation and chooses one of several permissible ways to remedy it,

without any desire for revenge or punishment. In both situations the litigation—the "protected activity"—is a "but for" cause of the losing party's response. But the law of retaliation focuses on the desire to punish or get even. *E.g., Egger v. Phillips,* 710 F.2d 292, 320 (7th · Cir.1983) (*en banc*) (material issue in free speech retaliation claim by public employee was whether defendant transferred plaintiff out of concern for effective functioning of office or "out of a desire to punish him for speaking out"); *Harvey v. Merit Systems Protection Bd.,* 802 F.2d 537, 547 (D.C.Cir.1986) ("retaliation is to be defined broadly to include any action *designed to punish an employee for exercising his protected rights* or to deter him from exercising those rights") (emphasis added).

The difference is critical in this case because of both the nature and the context of the underlying constitutional violation. The relevant context is that the defendants' Policy on Seasonal Displays was not adopted because the defendant disliked plaintiffs or their religious beliefs. As discussed in detail below, the record as a whole shows that the policy was adopted because of constitutional concerns about the private display of religious symbols in the halls of government. The Justices' opinions in *Capitol Square Review and Advisory Bd. v. Pinette,* —— U.S. ——, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), illustrate the fact that reasonable people can and do disagree on such questions without being hostile toward a particular faith or religion in general.

The nature of the underlying violation is critical here because it was not the *denial* of access to the forum that was held unconstitutional, but the *discriminatory* denial of access. See *Grossbaum,* 63 F.3d at 595–96 (policy denied plaintiffs' rights to free expression in nonpublic forum created by the Building Authority *on the same terms as all other persons,* regardless of religious or nonreligious nature of message). That violation could be remedied by opening access to the forum more widely, as plaintiffs wish. But the violation could also be remedied by closing off access to the forum. The Supreme Court's decisions in this area show that the owner of a nonpublic forum always has the

right to close the forum or to impose new nondiscriminatory restrictions on access. *E.g., Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3448–49; *Perry Educ. Ass'n,* 460 U.S. at 46, 103 S.Ct. at 955–56. The Court has recently reaffirmed a government's right to control its property, including the right to close a previously open forum:

> The fact that the Capitol lawn has been the site of public protests and gatherings, and is the location of any number of the government's own unattended displays, such as statues, does not disable the State from closing the square to all privately owned, unattended structures.

*Capitol Square Review and Advisory Board v. Pinette,* —— U.S. at ——, 115 S.Ct. at 2457 (Souter, J., concurring in part and concurring in judgment, joined by O'Connor and Breyer, JJ.); see *id.* at ——, 115 S.Ct. at 2467 (Stevens, J., dissenting) (expressly agreeing with this point). Accord, *Rosenberger v. Rector and Visitors of University of Virginia,* —— U.S. ——, —— – ——, 115 S.Ct. 2510, 2516–17, 132 L.Ed.2d 700 (1995) ("The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics.") (citing *Cornelius* and *Perry*).

Thus, when the Court of Appeals held that the Policy on Seasonal Displays violated the First Amendment, the Building Authority had a choice between constitutional alternatives. It could either leave its other policies alone, thus leaving the nonpublic forum with few restraints on access, or it could impose new, nondiscriminatory restrictions on that access. In making its decision, the owner of a nonpublic forum does not violate the First Amendment by considering the costs of litigation, the resources needed to administer the various options, or the results of litigation thus far. As plaintiffs conceded at the hearing, the Building Authority was entitled to respond to the Court of Appeals' decision, so long as it did so with a proper motive. In addition, the facially neutral policy of closing the forum is clearly a constitutionally permissible option. The owner does not lose that option when it loses a lawsuit. However, the owner does violate the First

Amendment if it makes its choice among permissible options based on a desire to get even with or punish a person who has sued it. See *Egger v. Phillips*, 710 F.2d at 320 (issue was whether defendant acted "out of a desire to punish [plaintiff] for speaking out"); *Hale v. Townley*, 19 F.3d 1068, 1073 (5th Cir.1994) ("state officials may not take retaliatory action against an individual *designed* either *to punish him* for exercising his constitutional right to seek judicial relief or to chill his exercise of that right in the future") (emphasis added); *Gagliardi v. Village of Pawling*, 18 F.3d 188, 195 (2d Cir.1994) ("The ultimate question of retaliation involves a defendant's motive and intent ...").

The parties have argued opposing positions about what evidence is needed to *permit* a finding of retaliatory motive. That question is often litigated in constitutional claims, labor law, and employment discrimination cases, especially where there are problems of so-called "mixed motives." See, *e.g., Mt. Healthy*, 429 U.S. at 285–87, 97 S.Ct. at 575–76; *Johnson v. University of Wisconsin–Eau Claire*, 70 F.3d 469, 481–82 (7th Cir.1995) (claims of retaliation under both Title VII and First Amendment); *Rakovich v. Wade*, 850 F.2d at 1189–91. The question of causation can be difficult when the evidence shows that the defendant had some permissible reasons for its decision but also considered some improper reasons. *Mt. Healthy* teaches that in the constitutional setting, the finder of fact must decide whether the defendant would have made the same decision even if the improper reasons had not been present. These "mixed-motive" cases dealing with causation all assume, however, that the finder of fact either has found or would be permitted to find an improper motive. In this case, the court need not reach the question of causation with mixed motives.

In this case, the decisive issue is not whether this lawsuit was a "but for" cause of the Building Authority's new policy. Clearly, it was. The decisive issue is whether the Building Authority was in fact motivated by a desire to punish or get even with plaintiffs for having brought this lawsuit. That is the essence of "retaliation," and that is what plaintiffs must prove to succeed on their

claim of retaliation for this litigation. The rule that plaintiffs advocate, which would allow a finder of fact to infer retaliatory intent when the evidence shows only that the owner has lost a lawsuit and then, in response, chooses another facially permissible option that does not satisfy the prevailing plaintiff, would reach beyond truly retaliatory action and would prevent owners of public property from honestly remedying constitutional problems in their past rules in ways that are consistent with both their constitutional obligations and their rights to control their property.

### B. Viewpoint Discrimination

 Plaintiffs' claim of viewpoint discrimination presents different legal issues. Government property managers may regulate the content of speech in a nonpublic forum, but they must be reasonable and viewpoint neutral in doing so. *E.g., Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3447–48. In deciding last year's motion, both this court and the Court of Appeals discussed at length the rights of government property managers to control access to the property they manage, and especially the law applicable to "nonpublic" forums. See *Grossbaum*, 63 F.3d at 586–88; 870 F.Supp. at 1454–59. In short, government property which has not been traditionally open to the public for all expressive activity or which has not been designated by the government as a place for a full range of expressive activity is a "nonpublic forum." The government may exercise control over access to a nonpublic forum for expressive activity "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, ——, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352 (1993) (quoting *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451). Accord, *Perry Educ. Ass'n*, 460 U.S. at 49, 103 S.Ct. at 957 ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity."); *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966) (a state, "no less than a private owner of prop-

erty, has power to preserve the property under its control for the use to which it is lawfully dedicated"). Thus, in nonpublic forums, government property managers may reasonably consider whether the content of particular subjects of expression accords with the purpose of the government property and may exclude subjects that do not further that purpose.

■ The line of cases including *Adderley, Perry, Cornelius,* and *Lamb's Chapel* has established beyond dispute that even when it regulates speech in a nonpublic forum, the government may not prefer one viewpoint over another on an "otherwise includible subject." See *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451. The Supreme Court's decisions in *Rosenberger* and *Lamb's Chapel* also show that "religion" is rarely a cognizable *subject* that may be totally excluded in a nonpublic forum. Rather, a particular expression that emanates from a religious perspective is likely to be a *viewpoint* that may not be suppressed if other viewpoints on the same general topic are allowed. See *Rosenberger,* —— U.S. at ——————, 115 S.Ct. at 2517–18; *Lamb's Chapel,* 508 U.S. at ——, 113 S.Ct. at 2147; see also *Air Line Pilots Ass'n Int'l v. Dept. of Aviation,* 45 F.3d 1144, 1159 (7th Cir.1995) ("The appropriate focus of the viewpoint inquiry examines whether the proposed speech dealt with a subject that was 'otherwise permissible' in a given forum."); *Hedges v. Wauconda Community Unit School Dist. No. 118,* 9 F.3d 1295, 1297–98 (7th Cir.1993) (putting *Lamb's Chapel* in the context of prior viewpoint discrimination cases).

In this case, the Court of Appeals found last year that the defendants' Policy on Seasonal Displays would produce precisely the viewpoint discrimination that *Lamb's Chapel* forbids. See 63 F.3d at 589–92. By its terms, the former policy would have allowed any private persons to the erect a secular holiday display such as a Christmas tree while prohibiting religious holiday displays such as a menorah. Therefore, the policy was held unconstitutional because it was not viewpoint neutral on the subject of the "holiday season." 63 F.3d at 588.

Plaintiffs' claim of viewpoint discrimination this year is quite different. Both sides agree that the policy at issue here, the amended Rule 13, is facially viewpoint-neutral. In fact, Rule 13 does not even express a preference for particular *subjects* over others, which would be permissible in a nonpublic forum. It allows no private displays at all, on any subject. Plaintiffs claim, however, that the defendants adopted this new facially neutral exclusion of all private displays for the *purpose* of discriminating against plaintiffs' viewpoint.

■ A government property manager acts unconstitutionally when it adopts an apparently evenhanded rule excluding expression if it acts with a motive to discourage or suppress a particular viewpoint. See *Rosenberger,* —— U.S. at ——, 115 S.Ct. at 2516 (when the "rationale for the restriction" is "the specific motivating ideology or the opinion or perspective of the speaker," the government engages in forbidden viewpoint discrimination); *Cornelius,* 473 U.S. at 811, 105 S.Ct. at 3453 ("The existence of reasonable grounds for limiting access to a nonpublic forum ... will not save a regulation that is in reality a facade for viewpoint-based discrimination."); *id.* at 812, 105 S.Ct. at 3454 (such "justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view"); *Perry Educ. Ass'n,* 460 U.S. at 49, 103 S.Ct. at 957 (upholding selective access to nonpublic forum in part because there was "no indication that the [government] intended to discourage one viewpoint and advance another"). See also *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, ——, 113 S.Ct. 2217, 2227, 124 L.Ed.2d 472 (1993) ("Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt."). In *Cornelius,* the Supreme Court stated that it could not decide without a more developed factual record whether the government's exclusions of certain advocacy groups from the nonpublic forum were based on impermissible motives. 473 U.S. at 812, 105 S.Ct. at 3454. The Court therefore remanded the case for a

factual determination as whether the otherwise permissible exclusion of some groups from the nonpublic forum "was impermissibly motivated by a desire to suppress a particular point of view." *Id.* at 812–13, 105 S.Ct. at 3454–55. Similarly here, the focus must be on the Building Authority's motives in amending Rule 13, for motive is the only basis upon which plaintiffs challenge the constitutionality of the rule.

█ The cases in this area also illustrate that even if the government does not itself possess the illicit motive, it may act unconstitutionally if it adopts or regulates in deference to the hostility of another party toward a particular viewpoint. In *Air Line Pilots Ass'n v. Dept. of Aviation,* the Seventh Circuit held that a government property manager may not bar a speaker's message solely in an effort to cater to the objections of others. 45 F.3d at 1157. Moreover, the Supreme Court warned in *Cornelius* that if a government property manager's purported justification for excluding certain groups was to quell controversy, the purpose could be permissible, but the asserted purpose could be "in reality a facade for viewpoint-based discrimination." 473 U.S. at 811, 105 S.Ct. at 3454. *Cf. May v. Evansville–Vanderburgh School Corp.,* 787 F.2d 1105, 1109 (7th Cir.1986) (desire to avoid potentially disruptive controversy and to maintain appearance of neutrality could justify viewpoint neutral exclusion of speakers from nonpublic forum).

### C. Proving Motive

To prevail on their new claims, plaintiffs must persuade the finder of fact that these defendants acted with an unconstitutional motive. In this case, plaintiffs have raised some evidentiary objections that require close attention to permissible methods of proving unconstitutional motive. For example, they have objected to testimony from Mr. Reinking, his assistant, and Building Authority board members about the reasons the Building Authority amended Rule 13 and about some details of the board's discussions that are not reflected in the board's official minutes. The court has overruled the plaintiffs' objections to that evidence, but a more detailed explanation of the reasons may be helpful.

Judges and juries often must try to determine the subjective purpose for which a person took some action—such as firing an employee, or selecting one vendor instead of another. Such inquiries are also common in cases claiming, for example, retaliatory discipline against a prison inmate. In cases challenging the constitutionality of legislation, the Supreme Court has sometimes said that it will not strike down legislation based solely on the motives of the legislators who voted for it. *E.g., Palmer v. Thompson,* 403 U.S. 217, 224, 91 S.Ct. 1940, 1944–45, 29 L.Ed.2d 438 (1971); *United States v. O'Brien,* 391 U.S. 367, 383–84, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968). Among the reasons supporting this practice is the difficulty of determining "the" motive for a group of legislators. See, *e.g., Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, ——, 113 S.Ct. 2217, 2239, 124 L.Ed.2d 472 (1993) (Scalia, J., concurring) ("it is virtually impossible to determine the singular 'motive' of a collective legislative body") (citing *Edwards v. Aguillard,* 482 U.S. 578, 636–39, 107 S.Ct. 2573, 2605–07, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting)); accord, *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 702–03, 101 S.Ct. 1309, 1332–33, 67 L.Ed.2d 580 (1981) (Rehnquist, J., dissenting). In *City of Hialeah* and *Edwards,* however, a majority of the Court did consider evidence of legislative motives and struck down the challenged laws in those cases based on that evidence despite the potential difficulties. But in cases where the substantive constitutional claim does not depend on subjective motive, courts may refuse even to consider evidence offered to prove motive. See, *e.g., Government Suppliers Consolidating Services, Inc. v. Bayh,* 133 F.R.D. 531, 539 (S.D.Ind.1990) (refusing to allow discovery of "motive" evidence in dormant Commerce Clause case because motive did not affect constitutionality of statute); see generally *Goldberg v. Whitman,* 743 F.Supp. 943, 947–53 (D.Conn.1990) (distinguishing between constitutional claims that require motive analysis and those that do not).

Despite the difficulties in determining motive, proof of an unconstitutional motive is essential to all of these plaintiffs' new claims. Judicial inquiry into the motives of the decisionmaking body is unavoidable. In determining the motives of a government body alleged to have violated the neutrality principles of the First Amendment, the Supreme Court has said: "Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, as well as the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *City of Hialeah,* 508 U.S. at —— – ——, 113 S.Ct. at 2230–31. The parties here have provided such evidence—evidence of the history of the dispute, the timing of the Building Authority's change in policy, and other circumstantial evidence that bears upon the reasons for the Building Authority's enactment of Rule 13, and contemporaneous records of the Building Authority's decisional process in the form of minutes from board meetings. In addition, they have provided evidence of the effects of the Building Authority's amended Rule 13 on private speech in the City–County Building. See *City of Hialeah,* at ——, 113 S.Ct. at 2228 ("Apart from the text, the effect of a law in its real operation is strong evidence of its object.").

The defendants also submitted testimony from depositions taken of Mr. Reinking and all the members of the Building Authority board. Some of the excerpts defendants submitted are essentially after-the-fact statements by the decisionmakers offered to show that the board's motives at the time of enacting Rule 13 were not illicit. Other statements fill in details of board discussions not reflected in the summaries in the minutes. Plaintiffs objected to the admission of all these statements at the hearing on the ground that neither Indiana nor federal law permits them. After hearing argument on the point, the court overruled plaintiffs' objection and admitted defendants' proffered deposition excerpts along with similar excerpts which plaintiffs then offered in rebuttal (without waiving their objection).

█ Citing one line of Indiana cases, plaintiffs' argue that the official minutes of a government body like the Building Authority board of directors may not be supplemented by oral testimony from members to show the body's "intent." See, *e.g., Jones v. State of Indiana,* 240 Ind. 230, 236–37, 163 N.E.2d 605, 608 (1960); *Cundiff v. Schmitt Development Co.,* 649 N.E.2d 1063 (Ind.App.1995); *Carter v. Allen,* 631 N.E.2d 503, 509 n. 4 (Ind.App.1994). These cases establish that where state law requires a local government body to make a certain finding in writing or to take certain action on the record, members may not fill in gaps in the written record by testifying that they "intended" to make the required finding or to take the required action. The reasoning of these cases does not extend to forbid members accused of harboring some illicit motive from testifying about the *reasons* they took a certain action. Even if Indiana law governed the admissibility of the defendants' testimony, and it does not, this line of Indiana cases does not support plaintiffs' objections.

Plaintiffs also cite a line of Indiana and federal cases holding that a court may not consider testimony from individual legislators about their intentions when the court is trying to determine the legislature's intent to help the court construe an ambiguous statute. See, *e.g., O'Laughlin v. Barton,* 582 N.E.2d 817, 821 (Ind.1991); *Covalt v. Carey Canada, Inc.,* 860 F.2d 1434, 1438–39 (7th Cir.1988) (explaining that statements of individual legislators after the fact are not reliable guides to the intentions of the legislative body at the time it enacted the legislation). This line of cases does not forbid consideration of evidence from individual legislators where subjective *motive* is the decisive constitutional issue.

Because of the obvious possibility that such after-the-fact statements made during litigation may not accurately reflect the decisionmaker's true motives, judges and juries need to treat them with caution. But treating such evidence with caution is different from refusing to consider it. Judges and juries consider such evidence from decisionmakers in many contexts. Examples include employment cases brought under the Equal

Protection Clause, *e.g., Auriemma v. Rice,* 910 F.2d 1449, 1455–56 (7th Cir.1990) (*en banc*) (defendant decisionmaker testified as to his motive because defendants' motive crucial in Equal Protection challenge even in qualified immunity analysis), and retaliation cases involving prison officials, *e.g., Harris v. Fleming,* 839 F.2d 1232, 1238 (7th Cir.1988) (defendant prison guard relied on own affidavit denying retaliatory intent, but genuine issue of fact existed as to his motivation). There is also an element of basic fairness that should not be overlooked here. Where a decisionmaker's motives are called into question based on inferences drawn from circumstantial evidence, whether the defendant is an individual or a group decisionmaker, the defendant should normally be able to deny that he, she, or it had an illicit motive by testifying to that effect. Plaintiffs' objections here would require a defendant to stand silent in the face of serious accusations of acting for illicit motives. Moreover, plaintiffs are arguing for a one-way rule. They admit that if a plaintiff alleging an unconstitutional motive could obtain direct evidence of such a motive by admissions of a decisionmaker, the plaintiff would be entitled to use such evidence. They argue that only a defendant accused of illicit motive is barred from testifying to deny that motive. That is not the law.

Of course, in cases where motive is the constitutional issue, more objective and contemporaneous evidence is likely to provide the better guidance about the decisionmaker's true motives. However, the Supreme Court has stated that in determining whether a law was enacted because of "invidious discriminatory purpose," "[i]n some extraordinary instances the members [of the decisionmaking body] might be called to the stand at trial to testify concerning the purpose of the official action...." *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 268, 97 S.Ct. 555, 565, 50 L.Ed.2d 450 (1977). A number of other cases support the admissibility of the decisionmakers' testimony about their own motives. See *La Crosse County v. Gershman, Brickner & Bratton, Inc.,* 982 F.2d 1171, 1175 (7th Cir.1993) (recognizing as "legally cognizable" the "difference between an individual legislator's testifying in expla-nation of his or her own motive for voting in a particular way and the same person's explanation of why a piece of legislation was enacted"); *id.* at 1177–78 (Fairchild, J. concurring); *United States v. Board of School Comm'rs of Indianapolis,* 637 F.2d 1101, 1108 n. 14 (7th Cir.1980) (district court properly considered under *Arlington Heights* "evidence presented on the question of racial motivation, including the statements of a black legislator who testified that race was never considered in drafting the legislation at issue"); *Bonham v. District of Columbia Library Admin.,* 989 F.2d 1242, 1244 (D.C.Cir. 1993) (in analyzing purpose prong of *Lemon* Establishment Clause test, court could look to "testimony of parties who participated in the enactment or implementation of the challenged law or practice").

The preceding discussion is not to say that such after-the-fact statements must be given much weight. The potentially self-serving character is obvious. But treating such statements carefully and critically is a matter going to weight and not to admissibility. In any event, as the following discussion of the facts in this case shows, ultimately the court would not draw the inference that the Building Authority acted with an illicit motive in amending Rule 13 even if the specific deposition excerpts were excluded and the case were decided on only plaintiffs' designated evidence and the defendants' evidence to which no objection was made. The testimony of the board members was essentially consistent with the reasons for the defendants' actions as shown by circumstantial evidence and contemporaneous records in the case.

## D. Findings of Fact

■ Against this legal background, the court will turn to a more detailed exposition of the facts relevant to the plaintiffs' likelihood of success on the merits of their claims for retaliation based on litigation and hidden viewpoint discrimination. There is substantial overlap between the facts relevant to these different theories.

### 1. Findings of Fact for Retaliation Claim

For many years the Building Authority has had a set of written "Rules and Regula-

tions Governing the City–County Building and Grounds." Until October 2, 1995, Rule 13 of those rules provided:

> 13. USE OF COMMON AREAS. The common areas, such as the Public Assembly Room, meeting rooms, observatory and others as may be so designated, may be reserved for use by tenants or tenant sponsored activities. Use by outside and public groups prohibited.

Pl.Ex. 2. Mr. Reinking has testified and defendants have argued that this original version of Rule 13 applied to the lobby, so that private use, including displays like plaintiffs' menorah, were prohibited all along. However, as defendants conceded at the hearing, and as is evident from the record of past private uses of the lobby, the original Rule 13 was never applied so as to prohibit private use of the lobby.

Plaintiffs first sought permission to display their menorah in the City–County Building lobby in 1985. They were permitted to display the menorah each year from 1985 to 1992. Mr. Reinking consulted with legal counsel (at least in 1990, 1991, and 1992) and decided to allow this private use of the lobby because "we really didn't see any harm in doing that." Reinking Dep. at 140. *Cf. May v. Evansville–Vanderburgh School Corp.*, 787 F.2d 1105, 1117 (7th Cir.1986) ("It would hardly occur to the average school administrator to think that when he allowed the girl scouts to use school premises he should be thinking what to do when the Ku Klux Klan asked to use these premises for its cookie sale...."). In 1992 the menorah display generated some controversy. The Indiana Civil Liberties Union (ICLU) objected to the display of the menorah under circumstances that might lead observers to conclude that the government endorsed the plaintiffs' religious message. The ICLU proposed that the Building Authority solve this problem by adopting a policy that would make the lobby an open public forum. Pl.Ex. 23 & 24. The Jewish Community Relations Council (JCRC) also objected to the display of the menorah on government property. The JCRC wrote that the display of religious symbols in the halls of government "gives the unavoidable message that government has

placed its imprimatur on religion. At the very least, such a message is unwise." Pl. Ex. 31. The JCRC (correctly) cautioned that if the Building Authority declared the lobby a public forum, it would not be possible to discriminate among displays on the basis of content, and warned that the "logical, and inevitable outcome of declaring a public forum is made clear by the experience of Cincinnati in which the KKK was permitted to erect a cross, on the basis of the same arguments used by Lubavitch of Cincinnati to erect its menorah." The JCRC argued that the Building Authority should not open the forum but should instead "develop a policy which does not permit religious displays within the City–County Building, so as to avoid the appearance of governmental endorsement of one religion over others."

The Building Authority did not adopt the ICLU's proposal of an open public forum in the lobby. Board minutes and the testimony of Mr. Reinking show that in 1992 and 1993, the Building Authority considered and explicitly rejected the idea of opening the forum because it would give up much of its control over uses of the lobby. Pl.Ex. 16; Reinking Dep. at 143, 148–49. However, the Building Authority adopted on October 4, 1993, its "Policy on Seasonal Displays," which the Court of Appeals later held unconstitutional. The records relating to the board's adoption of that policy show that the board was trying to deal with the "controversy" that the prior menorah displays had generated. The board's records indicate that the principal reason the board adopted the policy was to respond to the Establishment Clause concerns raised by both the ICLU and the JCRC. The board deliberately selected the policy option that would let it retain more control over the lobby while still accommodating at least some displays. See Pl.Ex. 16; Fox Dep. 57–59, 130–31; Hohmann Dep. 28, 36. Although this court and the Court of Appeals eventually concluded that a neutral policy allowing seasonal displays by private groups, including religious symbols, would not violate the Establishment Clause in this setting, the Building Authority's concerns about the Establishment Clause were not at all unreasonable. The opinions in a recent Supreme Court decision indicate that at least

some members of the nation's highest court might well consider the Building Authority's policy to have been *mandated* by the Establishment Clause. *Capitol Square Review and Advisory Bd. v. Pinette*, —— U.S. at ——––——, 115 S.Ct. at 2464–73 (Stevens, J., dissenting) (arguing that Establishment Clause prohibits display of religious symbols in traditional public forum at seat of government despite availability of neutral policy of equal access), and at ——––——, 115 S.Ct. at 2474–75 (Ginsburg, J., dissenting) (same).

After the Court of Appeals issued its order of November 29, 1994, prohibiting the Building Authority from enforcing the "Policy on Seasonal Displays," plaintiffs immediately set up their menorah display during Chanukah in 1994. The Building Authority put up a Christmas tree, as it has for many years.[2] Other groups and individuals contacted the Building Authority seeking to put up related displays in the public lobby. One woman who said her religion was Wicca sought and received permission to display a sign with a pentacle (a five-pointed star in a circle) to celebrate the winter solstice. A minister sought and received permission to display a Christian cross in the lobby for a few days at Christmas. Another man sought and received permission to display signs protesting the display of religious symbols in the public building. The Building Authority granted permission for these displays in 1994 solely on the basis of the Court of Appeals' emergency order. Other groups and individuals contacted the Building Authority about similar displays but did not follow through. See Pl.Ex. 36 (request to display Nativity scene at Christmas); Pl.Ex. 38 (request to display sign reading "Jesus Christ Is A Myth; The Winter Solstice Is The Reason for the Season."). These events attracted quite a bit of media attention.

During the time these various displays were up, Mr. Reinking heard a number of negative comments about the Wicca pentacle. The pentacle display was apparently stolen only an hour after it was put up. Mr. Reinking also heard negative comments about the

cross that was displayed and about an event during which Rabbi Grossbaum brought a group of children into the lobby, "seemed to be conducting classes regarding the menorah and then led the children in some songs." Reinking Dep. at 162–63. He said that the hostile comments he heard about all of these religious displays were to the effect that these religious symbols should not be permitted in or were not appropriate for the building.

On August 15, 1995, the Court of Appeals issued its opinion holding that the Policy on Seasonal Displays violated plaintiffs' Free Speech rights. A copy of the opinion was sent to each director of the Building Authority before the board's September 5, 1995, meeting, and at the public meeting counsel reviewed with the board several litigation options. The board agreed to hold an executive session to consider these options in the next month. The board then discussed with its counsel Rules 13 and 14. The minutes state:

> It was observed that these original rules reflect the purpose served by the lobbies and corridors to provide unobstructed and safe ingress and egress to City and County government offices by employees and by the general public conducting business in the City–County Building. In this regard, the Board of Directors briefly discussed the effects that the new security measures at the City–County Building will have on pedestrian traffic in the common areas.

Pl.Ex. 8.

On October 2, 1995, the board held an executive session at which it considered this litigation. The board then met in public session. Among the matters considered was a proposal to: (1) revise Rule 13 to prohibit all private groups from displaying signs or other structures in the common areas, including the lobby; (2) revise Rule 14 to clarify which common areas are subject to its prohibition on political uses; and (3) rescind the Policy on Seasonal Displays. The minutes concerning these discussions provide as follows:

---

**2.** The government may "use its own property to send a non-religious holiday message without opening its property to messages by others."

*Grossbaum*, 63 F.3d at 592 n. 12, explaining *Lubavitch Chabad House, Inc. v. City of Chicago*, 917 F.2d 341 (7th Cir.1990).

The Directors reviewed rules 13 and 14 of the Rules and Regulations Governing the City–County Building. Legal counsel explained that these Rules and Regulations were adopted by the Authority pursuant to provisions contained in the City–County Building Lease dated August 3, 1959 between the Authority, the City of Indianapolis, and Marion County. In conjunction with a review of these two rules, the Directors also considered its policy on religious displays and symbols adopted on October 4, 1993. Copies of the two rules and the policy had been furnished to the Directors prior to the meeting.

The rules and the policy under review concern the use of the common areas of the City–County Building. Legal counsel explained that the common areas in the building are those public areas not leased to the City and County which include lobbies, corridors, the Public Assembly Room, Observatory, and other meeting areas. The purpose served by the lobbies and corridors is to provide unobstructed and safe ingress and egress to the City and County government offices by employees and by the general public conducting business with government offices and courts.

Rule 13 restricted the use of the common areas to tenants or tenant-sponsored activities. The rule prohibited use of the common areas by outside groups. Legal counsel explained that from the opening of the City–County Building in 1962, rule 13 banned non-governmental, private groups from erecting displays and structures in the common areas. In recent years, however, certain private groups were permitted to erect displays and structures in the common areas, notwithstanding the prohibition in rule 13. The problem with private displays and structures is the need for the Authority to provide unobstructed and safe ingress and egress to government offices. Certain private displays and structures can create controversy, disruption, and hostility. This causes a concern for security, public safety and pedestrian control in the lobby and corridors. In one instance, a private display caused sufficient hostility that it was stolen within one hour after its erection. The lobby of the City–County Building experiences an exceptionally high flow of daily people traffic for an office building. The area in the lobby around the Tower elevators has always been congested with traffic due to the under-elevatored condition of the building. In addition, access to and from the City–County Building will be impeded and space in the lobbies will become more limited with the new security measures approved by the City–County Council in June, 1995. A walk-through metal detector and an x-ray scan conveyor are to be installed in the lobby at the Court Wing elevators and access to the Court Wing from the Tower will be restricted. One of the effects of the new security measures will be an increased flow of traffic through the Tower lobby.

Rule 14 prohibits the use of the common areas for political activities and the display of political signs. Legal counsel explained that this rule has from its inception always been strictly enforced by the Authority.

The recommendation by legal counsel to the Board of Directors is that (i) rules 13 and 14 be restated to read in the form distributed to the Directors, (ii) the policy on religious displays and symbols adopted on October 4, 1993 be rescinded, and (iii) the General Manager be instructed to strictly enforce and adhere to restated rules 13 and 14.

The Directors reaffirmed that the Authority is responsible for assuring unobstructed and safe access by employees and the general public to the government offices and courts housed in the building. The Directors observed that over the past two years, new proposals for security measures for the City–County Building have been extensively reviewed and discussed including their impact on pedestrian traffic flow and ready-access by the public to the building. From time to time, the Authority has been asked by the City administration to find ways to improve the flow of traffic and the accessibility of government offices to the general public. The Directors agreed that the new security measures with the installation of metal detectors and x-ray scanners will slow the flow

of traffic in the City–County Building and will to some degree increase the flow of traffic in the lobby of the Tower. The Directors also acknowledged that the under-elevatored condition of the building has placed a burden on moving people traffic in the lobby of the City–County Building. The Directors agreed that private displays and structures may impede the flow of traffic and may create a public safety risk. This is especially true with respect to private displays and structures which are prone to controversy, disruption and hostility. The Directors concluded that for these reasons, the use of the common areas of· the building should be restricted to the Authority and to City and County tenants. Upon motion duly ·made and seconded, the Board of Directors unanimously approved the following resolutions:

RESOLVED, that rules 13 and 14 of the Rules and Regulations Governing the City–County Building be amended and restated to read as follows:

Rule 13. USE OF THE COMMON AREAS. Use of the common areas of the City–County Building including lobbies, corridors, the Public Assembly Room, Observatory, and other meeting rooms (generally those public areas ·not leased to governmental tenants) is restricted to the Building Authority and its governmental tenants. No displays, signs or other structures shall be erected in the common areas by any non-governmental, private group or individual since such objects may interfere with unobstructed and safe ingress and egress by employees of the governmental tenants and by the general public conducting business with government offices and courts in the City–County Building.

Rule 14. USE OF COMMON AREAS FOR POLITICAL ACTIVITIES. Use of the common areas of the City–County Building (generally those public areas not leased to governmental tenants) for political activities is prohibited. No political signs, pictures or other materials shall be posted or displayed in the common areas.

RESOLVED, FURTHER, that the policy on religious displays and symbols adopted by the Board of Directors at its October 4, 1993 meeting be, and it hereby is, rescinded effective immediately.

RESOLVED, FURTHER, that the General Manager be, and he hereby is, instructed to strictly enforce and adhere to rules 13 and 14 as amended, restated and adopted.

Upon motion duly made and seconded, the Board of Directors unanimously approved the following resolution:

RESOLVED, that legal counsel for the Authority is hereby instructed not to appeal the decision by the United States Court of ·Appeals to the United States Supreme Court by filing a petition for *writ of certiorari.*

Pl.Ex. 9.

As is often true in retaliation cases, plaintiffs have not offered any direct evidence showing that the Building Authority acted to retaliate against plaintiffs for filing the lawsuit. Instead, plaintiffs argue that circumstantial evidence should lead the court to infer that the board acted for that purpose. Plaintiffs base their factual argument on (a) the timing of the Building Authority's action; (b) the manner in which the Building Authority adopted the revised rule; and (c) plaintiffs' contentions that the Building Authority's proffered reasons for the new rule are pretexts and not worthy of credence. The Building Authority argues that it revised Rule 13 as a way of dealing with expected pedestrian traffic problems resulting from new security measures to be instituted in the near future in the City–County Building. The Building Authority was also concerned about the controversy and hostility generated by the activity in December 1994, and about what it perceived as a loss of its ability to control the lobby.

**Timing:** The Building Authority took up the matter of revising Rule 13 immediately after the Court of Appeals issued its decision

on August 15, 1995, raising the issue at its next meeting and passing the resolution at its second meeting after that decision. However, the scope of the forum was an issue the Building Authority had considered before. Mr. Reinking testified in his deposition that in early 1993, he asked counsel to review the rules and regulations and to prepare "a larger scale" policy that would help the authority control the number and type of displays that are in the building. Reinking Dep. at 143. At that time, the board and management of the Building Authority did not want to open up the lobby as a public forum, but the only step they took to restrict access was to adopt the Policy on Seasonal Displays, which dealt with the most immediate problem they had faced. See Reinking Dep. at 143, 149; Fox Dep. at 57–59; Hohmann Dep. at 28, 36. The events of December 1994 obviously raised these concerns again, but the Building Authority board and management did not take action while the appeal was pending in the Court of Appeals. There is no evidence of any new controversy concerning access during that interim, after the 1994 holiday season came to a close.

In June 1995, the City–County Council appropriated funds to upgrade security for at least the courts wing of the City–County Building. The plan calls for installation of a magnetometer on the ground floor of the west wing of the building, where a number of courts are located. All persons going into that wing will be required to pass through the magnetometer. In addition, access between the west wing and the center tower of the building will be blocked off above the first floor. As a result, many people who customarily go through the west wing to avoid the already crowded center tower elevators will be forced to use the center tower elevators again. Mr. Reinking also received information indicating that the volume of traffic and the slow pace of the screening procedure were likely to create lines of people stretching back into the main lobby as they waited to pass through the magnetometer. See generally Reinking Dep. at 248–50.

Mr. Reinking testified that in May and June 1995, he was working with legal counsel to formulate a more "global" policy regarding displays in the common areas of the building. He and counsel planned at that time to propose a new policy that would be much more restrictive, limiting access to only governmental tenants, regardless of the outcome of the appeal. Reinking Dep. at 210–11. In fact, Mr. Reinking was actually denying a few requests for displays on the basis of this proposed policy. *Id.* However, he testified that counsel had advised him to delay acting on any new policy until the Court of Appeals ruled because a revision "might appear to them that we were trying to make an end run around their ruling, to do something that would diminish the effect of their ruling." Reinking Dep. at 212.

Plaintiffs point out correctly that the pending appeal posed no *legal* obstacle to the Building Authority's power to revise its rules. They argue that if the Building Authority had really wanted to restrict access based on any of its asserted reasons, it would have acted sooner. Because the delay was not necessary, plaintiffs would have the court infer that the asserted reasons for the board's action were pretexts and that the ultimate decision was intended to retaliate against and punish plaintiffs. The court does not find that that inference is warranted. Although there was no legal impediment to revising the rules while the appeal was pending, the court finds nothing suspicious or sinister in the decision to delay action until the Court of Appeals ruled. The Building Authority and its counsel could reasonably choose, especially in the absence of a pressing emergency, not to complicate the appeal by rewriting the rules, having the parties give the Court of Appeals notice of the change, and perhaps argue about the change, all after the appeal had been submitted but before it was decided. Whether counsel and the Building Authority correctly gauged the possible reaction of the Court of Appeals to such developments or whether others might reasonably have taken action sooner does not matter here. At a minimum, the Building Authority did not act so unreasonably in delaying action that the court should infer that the Building Authority's asserted reasons for acting were pretexts for an unconstitutional retaliatory motive.

**Manner:** Plaintiffs point to a number of facts concerning the Building Authority's revision of its policy which, they say, further support an inference of retaliatory or discriminatory intent. Rabbi Grossbaum wrote to Mr. Reinking on August 28, 1995, requesting permission to display the menorah during Chanukah in December 1995. Pl.Ex. 43. Mr. Reinking did not reply to that letter until October 3, 1995, the day after the board revised Rule 13. Pl.Ex. 49. Neither the Building Authority nor its counsel notified plaintiffs that a revision to Rule 13 was being considered or proposed. Plaintiffs also point out that when Stephen Schroeder, the man who had displayed the signs protesting religious symbol displays in 1994, wrote to Mr. Reinking requesting permission to display his signs again in 1995, Mr. Reinking responded promptly and informed Mr. Schroeder that the Building Authority was "reviewing with its legal counsel the options available to the Authority in response to the decision" of the Court of Appeals. He said the Building Authority was "not considering requests for displays" until those options had been explained to the directors. Pl.Ex. 44 & 45.

Mr. Reinking did not tell Mr. Schroeder that the Building Authority was considering amending its rules of access, nor did he tell Mr. Schroeder anything that Rabbi Grossbaum and his counsel could not have surmised. The Building Authority complied with Indiana's open door law in revising its policies and was not required to give plaintiffs or their counsel any individual notice of the meeting or the proposed revision of the rules. The court draws no inference of retaliatory or discriminatory intent from the defendants' failure to keep plaintiffs informed about their thoughts and plans.

Plaintiffs have reviewed the available written records concerning the board's actions and have deposed Mr. Reinking, his assistant, and all five board members. Plaintiffs have not identified any evidence directly indicating any hostility or retaliatory animus directed at plaintiffs. In fact, the board members testified they were not aware of Rabbi Grossbaum's request to display the menorah in 1995 when they acted to revise Rule 13. From this absence of such evidence and the fact that litigation counsel also prepared the board's minutes, plaintiffs would have the court infer that the defendants had a retaliatory and/or discriminatory motive but made a conscious decision to keep the record "clean." [3]

The board members who were deposed testified that the plaintiffs' menorah was not mentioned in their discussion of the proposed revision to Rule 13. Plaintiffs argue that that testimony should not be believed because it is inherently incredible that the directors would not have talked about the specific situation that triggered the controversy. They also assert that Mr. Reinking contradicted the directors' testimony. In the deposition, counsel called Mr. Reinking's attention to the passages in the October 2, 1995, minutes mentioning that "certain private displays" can create or are prone to "controversy, disruption, and hostility." The transcript reads:

Q: [W]hat were the displays that were discussed in connection with those entries?

A: As I recall, that part of the discussion talked about the displays during, basically, the month of December of 1994 and, I guess, the commotion or whatever that was caused by these displays being in the building.

Q: Those displays, just so we're on the same page, were the menorah, the pentacle for the hour that it was there, the cross, and Mr. Schroeder's poster display?

A: Yes, I believe those were the primary items that were talked about in that area.

---

3. Plaintiffs' argument on this point has an obvious element of "Heads I win, tails you lose." Plaintiffs seize on every direct or indirect mention of their menorah to support their motive arguments, yet they also say that the absence of more such mentions also supports their argument. This form of argument suggests that the more objective evidence, which tends to be less vulnerable to the possibilities of either convenient memories or argument by speculation, provides a more solid foundation for the court's findings on the defendants' motives.

Reinking Dep. at 240. From these different accounts of the meeting, the court finds that, as reflected in the minutes, the board discussed the controversy and "commotion" caused by all the displays, but there is no evidence they singled out plaintiffs and their menorah for special attention.[4]

As the court noted last year, and as remains true today, the evidence does not indicate that the defendants have ever had any hostility or religious-based animus against the plaintiffs. Such animus is a theoretical possibility, but the evidence simply does not support the claim here. Plaintiffs' arguments to the effect that the board must have talked about them and their menorah, and that the absence of such evidence must reflect a conspiracy of silence, exaggerate the plaintiffs' significance to the defendants. The evidence shows that the Building Authority permitted plaintiffs to display their menorah for eight years. After the ICLU and JCRC objected in 1992, the Building Authority reconsidered its position, and did so with a bigger picture in mind than the plaintiffs and their menorah, including its ability to maintain control of its property. When it considered the revisions to Rule 13 in October 1995, the Building Authority board was obviously aware of plaintiffs' menorah and the other religious displays that had been up during 1994. But the evidence shows the board was not focusing solely on those particular displays or their sponsors. The board, having learned firsthand about the difficulties of managing any type of forum open to the public consistent with the First Amendment, was considering the broader perspective of how to keep the desired degree of control over the lobby and other public areas. The absence of specific discussion aimed at plaintiffs is not suspicious. It merely indicates that the board was basing its decision on matters that were more general and more important than the particular request that had raised the issue. In view of the law of nonpublic forums, limited public forums, and public forums, that is

entirely appropriate. In short, the manner in which defendants amended Rule 13 does not tend to show a retaliatory motive.

**The Defendants' Asserted Reasons:** Plaintiffs argue that the reasons asserted by the Building Authority for revising Rule 13 have no real substance and are merely a pretext for unconstitutional motives. As noted above, the Building Authority minutes reflect concern about the effects that unrestricted access to the lobby for private displays could have on pedestrian traffic in the building, especially as new security measures are instituted. The board was also concerned about the controversy and hostility generated by some private displays, including the various displays that were set up during the 1994 holiday season. More generally, the record as a whole shows that since the issue of private displays first arose, the board has been concerned about its ability as owner and manager of the property to maintain control over access to the lobby.

Plaintiffs have presented evidence showing that the City–County Building experiences security problems that are more serious than any difficulties experienced thus far with private displays in the lobby. (For example, the building receives bomb threats fairly frequently, and must often deal with disorderly and/or intoxicated persons, and persons with weapons. See Pl.Ex. 32, 33, & 34. In one year, thousands of knives and 191 guns were confiscated at a metal detector outside the domestic violence courtroom. Def.Ex. 12.) The holiday season displays last year generated "hostility" and controversy, but no physical disturbances such as fistfights or other altercations. The disappearance of the pentacle display has been attributed to theft. It is not unreasonable to attribute that incident to the hostility and controversy surrounding the displays. Nor is it unreasonable to expect that if the forum remains open to private displays, some future displays will generate substantially more controversy and hostility. See *Capitol Square Review and Advisory Bd. v. Pinette,* —— U.S. at —— &

---

4. Both parties chose to present deposition testimony instead of calling witnesses to testify at the preliminary injunction hearing. Plaintiffs have asked the court to find some of that testimony not credible. The court does not find the testimony not credible on the basis of merely a paper record, but, as discussed above, bases its findings primarily on more objective and contemporaneous evidence of the defendants' motives.

n. 2, 115 S.Ct. at 2465 & n. 2 (Stevens, J., dissenting) (display of menorah in public forum prompted request by Ku Klux Klan to display cross, followed by vandalism, protests, and requests to display many more crosses to express opposition to KKK).

Defendants do not argue that the new Rule 13 is necessary to make the lobby a physically safe place. They argue that if the lobby remains a forum open for private displays, including some displays likely to generate controversy, hostility, and crowds, the lobby will become significantly more crowded. At the same time, say the defendants, the lobby is already crowded, and they reasonably expect the lobby to become significantly more congested as new security screening measures are implemented. Defendants argue that closing the forum to all private displays is a reasonable step to deal with these expected problems.

The parties have submitted a significant quantity of evidence concerning security problems and the plans for upgrading security in the City–County Building. That evidence shows that the government tenants and the Building Authority have been considering and debating for a number of years various proposals to enhance security. The Building Authority has favored proposals that would require all visitors to any part of the building to go through a magnetometer to search for weapons, and possibly to have parcels, purses, and briefcases X-rayed for weapons or explosives. Others have objected to such screening for all visitors and have proposed security procedures only for those persons entering the parts of the building where courts are located. The evidence shows that in June 1995, the City–County Council appropriated funds for security screening of persons entering the west wing of the building, where many (but not all) courts are located. That proposal is expected to be implemented soon (when the necessary equipment arrives), but it had not been implemented yet when the Building Authority voted to revise Rule 13 to limit private displays in the lobby. Because of the loca-

tion of the new security screening devices, the existing volume of pedestrian traffic into the west wing, the existing volume of pedestrian traffic in the center tower lobby, and the expected increase in lobby traffic when passages between the center tower and the west wing are blocked above the first floor, the new plan is likely to cause more serious pedestrian congestion in the lobby of the center tower of the building.[5]

In general terms, these are the matters the board referred to in its minutes of September 5, 1995, concerning "the effects that the new security measures at the City–County Building will have on pedestrian traffic in the common areas," Pl.Ex. 8, and in more detail in the minutes of October 2, 1995, when the board revised Rule 13 to prohibit private displays in the lobby. Plaintiffs contend that these concerns are pretexts for the revision of Rule 13, pretexts for unconstitutional motives of retaliation and discrimination against plaintiffs' views. Plaintiffs point out that until the Court of Appeals ruled last August, there was never any discussion linking Rule 13 or lobby displays to security plans or pedestrian traffic concerns. They contend that the private displays in the lobby are already relegated to an out-of-the-way spot behind the main staircase in the center tower, and that even that area is some 60 to 80 feet from the planned location of the magnetometer in the west wing. Plaintiffs also point out that Rule 13 imposes no restrictions on lobby displays by government tenants in the building, and that such displays could interfere with traffic flow or pose security concerns much more troublesome than private displays, like theirs, which are now prohibited by Rule 13. Plaintiffs argue that if the board's concerns about traffic flow and security were in fact legitimate, the board would have adopted rules that would have applied to lobby displays by government tenants of the building. In addition, they suggest, the more reasonable way to address the congestion problems would be "time, place, and manner" restrictions that would be neutral as to content and the identity of the speaker.

---

**5.** This material is set forth in detail in the depositions of Mr. Reinking and, to a lesser degree, Mr. Fox.

The court finds that the defendants' concerns about increased traffic flow and congestion in an already-crowded lobby are legitimate and sincere, not pretexts hiding some other motivation for the revision to Rule 13. First, the City–County Council's appropriation in June 1995 was a sufficiently concrete step toward implementing the new security plan that defendants' concerns are not speculative. Second, the Building Authority cannot predict precisely how serious the increase in congestion will be when the new security procedures are implemented, but it has reasonable grounds for expecting that increase to be significant. It would be irresponsible for the Building Authority not to consider other steps it could take to reduce other sources of congestion. Displays that either physically block or alter pedestrian flows, or that cause groups of people to gather in the lobby are certainly not the greatest threat, but the defendants' concerns are not unreasonable. Third, the timing of the defendants' concerns linking private displays to the new security plans and traffic flow problems is not as suspicious as plaintiffs suggest. The defendants were considering the linkage long before the Court of Appeals ruled in August. As noted above, it was not unreasonable for them to wait until the Court of Appeals ruled before taking action. Fourth, the Building Authority could reasonably view the displays that followed from the litigation last year as only a hint of the requests and displays that it could expect in future years, particularly if groups with far more controversial messages were to request access to the lobby. These scenarios might not have been laid out in painful detail in considering the amendment to Rule 13, but Mr. Reinking and the board had been learning about public forum law at least since late 1992. "[T]he Government need not wait until havoc is wreaked to restrict access to a nonpublic forum." *Cornelius*, 473 U.S. at 810, 105 S.Ct. at 3453.

The plaintiffs' arguments based on the lack of regulation of displays sponsored by government tenants or the alternative of time, place, and manner restrictions do not support a finding that the defendants' asserted reasons are pretexts. In a series of hypothetical questions to Mr. Reinking, plaintiffs showed that the Building Authority's rules do not contain limitations as to size, duration, or frequency of such displays. They also showed that the rules do not authorize the Building Authority to refuse especially controversial displays by tenants. For example, plaintiffs hypothesized government displays featuring the speeches of Minister Louis Farrakhan or an explicit "safe sex" display for government employees as part of an AIDS awareness program.

Plaintiffs are correct that the written rules in place would not apply to restrict displays by the governmental tenants. However, Mr. Reinking testified that as the person in charge of making such decisions, he would act to restrict some displays by governmental tenants:

Q: Regardless of who placed that display, a display that creates controversy could create confrontations between people and lead to a security concern; is that right?

A: [I]t's certainly my understanding of the intended application of our policy that we would not permit our tenants to place items that we thought were going to create controversy or confrontation. We would ask them if they have to display something like that, to use their own space....

\* \* \* \* \* \*

Q: There is no limitation in the policy, though on the number of displays that a tenant can request to place in the lobby?

A: No, that would be something that the authority would have to administer. And if we felt that an agency was asking for a number of displays or size of displays, whatever, that disrupt traffic in and out of the building, then we would tell them so. And we would probably deny their requests.

Q: That denial would not be based on any of the existing rules that are set forth in the rules and regulations of the Building Authority, right?

A: I think we would refer to Rule 13 and its emphasis on traffic, safe ingress

and egress and apply that same logic to the tenants if their requests were too numerous.

Reinking Dep. at 245–46, 247–48.

This testimony indicates that the Building Authority has been concerned about the potential effects of controversial displays generally, not just controversial private displays. However, the Building Authority has tools available to deal with tenants that are not available in dealing with private persons. To the extent the Building Authority opens the lobby for expressive activity by private persons, it is subject to the First Amendment. Viewpoint discrimination is prohibited, and attempts to limit displays based on "subject matter" are likely to embroil the Building Authority in more controversy and litigation, especially in the view of the inherent difficulty in drawing a line between prohibited "viewpoint" discrimination and the sometimes permissible "subject matter" discrimination. See, *e.g.*, *Air Line Pilots Ass'n,* 45 F.3d at 1159 (noting problem of avoiding "viewpoint inquiry by retreating to an exaggerated level of generality"). Time, place, and manner restrictions would remain available to the Building Authority, of course, but those would have to be spelled out in considerable detail, and could reasonably be expected to require a significant investment of management's time (and taxpayer cash for legal fees) to administer fairly and constitutionally. In a nonpublic forum, a broad formal prohibition on private displays therefore is a permissible and understandable way to restrict access to avoid dealing with especially controversial displays.

The Building Authority's relationship with its tenants is very different. The plaintiffs have not cited any authority suggesting that the government agency tenants of the Building Authority could sue under the First Amendment if the Building Authority denied a request for a lobby display based on any reason, even if that reason were not spelled out in the Building Authority's rules. The Building Authority is in a position to "jawbone" tenants who wanted to put up a display that would cause any sort of problem for the Building Authority, whether by reason of size, duration, or even controversial content.

Unlike private persons, who are entitled, and can reasonably· be expected, to try to push their First Amendment rights to their outermost boundaries in a public forum or a nonpublic forum, it appears that the government tenants do not have such rights, and the Building Authority can protect its interests without a detailed set of rules. See *Serra v. U.S. General Services Admin.,* 847 F.2d 1045, 1048 (2d Cir.1988) (Free Speech clause does not preclude the government from controlling its own expression or ·that of its agents) (citing *Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 139 n. 7, 93 S.Ct. 2080, 2105 n. 7, 36 L.Ed.2d 772 (1973) (Stewart, J., concurring)); accord, *Rosenberger,* —— U.S. at —— – ——, 115 S.Ct. at 2518–19 (state university free to restrict speech of its own agents). As Mr. Fox testified, the building manager can use reason with government tenants and is expected to use his judgment in dealing with them. Fox Dep. at 103–04; 113–14; 43–45. See also Reinking Dep. at 245–46, 248; 260–64.

Because of the different relationship the Building Authority has with its tenants, plaintiffs' pretext argument based on the failure to impose more restrictions on tenants' displays fails. Similarly, although the Building Authority could have chosen to address these concerns with time, place, and manner restrictions, its preference as a property manager to maximize its control over its property and to avoid having to administer a neutral time, place, and manner regime is both understandable and constitutional. In sum, the court finds that the defendants' considerations of traffic and security-related matters in revising Rule 13 are not pretexts for some other motive. The traffic and security-related considerations are not necessarily compelling reasons for the Building Authority's action, nor are they the only reasons for its action. However, the court finds that these matters were in fact part of the Building Authority's honest reasons for revising Rule 13 to prohibit private displays.

In addition to the traffic and security-related concerns, a fair reading of the record also shows that the Building Authority based its decision on a desire as a property owner

and manager to maintain control of its property and to avoid the controversy and complexities that face an owner of a nonpublic forum. Plaintiffs argue that this desire to avoid controversy is merely a pretext for other illicit motives. *Cornelius* makes clear that an owner of a nonpublic forum may restrict access or even close the forum in order to avoid controversy. 473 U.S. at 810, 811–12, 105 S.Ct. at 3453, 3454; accord, *May v. Evansville–Vanderburgh School Corp.*, 787 F.2d at 1109. At the same time, the court must consider carefully the possibility that a professed desire to avoid controversy is in fact only a pretext for suppressing particular viewpoints. *Cornelius*, 473 U.S. at 812–13, 105 S.Ct. at 3454–55.

The Building Authority's primary purpose is to manage the building so that the work of the government offices and agencies housed there may be carried out. Managing a nonpublic forum is a complicated task, and one that can both distract from the primary mission and become very expensive, even when handled absolutely correctly. After the controversy over the menorah began to develop as the ICLU and JCRC objected to the menorah display in 1992, the Building Authority rejected the ICLU's proposal for an open public forum in the lobby. Pl.Ex. 14, 23–25, 31. In December 1993, the board discussed the issue again and "agreed that no display or act should be permitted in the lobby of the City–County Building which would cause the lobby to be declared a 'public forum.'" Pl.Ex. 16. The board reiterated this view in its meeting of December 6, 1994. Pl.Ex. 17. In addition, Mr. Reinking testified in his deposition that this litigation had cost the Building Authority approximately $100,000 up to that time. He acknowledged that there were things other than litigation that he would rather spend his time doing to manage the building.

As the Building Authority argued at the hearing, the experience of December 1994 indicated that the Building Authority had lost some of its ability to manage the forum. The Building Authority minutes expressly reflect concern about controversy and hostility generated by some private displays, including the various religious and anti-reli-

gious holiday displays in 1994. As plaintiffs point out, the evidence does not reflect any fistfights or other physical disturbances or even demonstrations during the 1994 holiday season. However, the Supreme Court has made it clear that such proof of past disturbances is not required to justify denial of access to a nonpublic forum on grounds that the proposed use may disrupt the property's intended function. *Perry Educ. Ass'n*, 460 U.S. at 52 n. 12, 103 S.Ct. at 959 n. 12. As the Court put it in *Cornelius*, "the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum." 473 U.S. at 810, 105 S.Ct. at 3453.

These concerns of the defendants are not objectively unreasonable such that they should be deemed a pretext. A manager of public property who opens up the property for public use must be prepared to manage some difficult issues and can expect litigation, expense, and awards of opposing counsel's fees if he or she errs. A number of recent cases around the country deal with displays of menorahs and crosses in traditional public forums in contexts where the potential for controversy and at least the risk of violence is clear. See generally *Capitol Square Review and Advisory Board v. Pinette*, —— U.S. at ——, 115 S.Ct. at 2445 (noting sequence of symbols displayed and collecting cases). In the context of a nonpublic forum, moreover, where the Supreme Court says the manager may restrict access based on "subject matter," the Court has acknowledged that the distinction between permissible "subject matter" discrimination and prohibited "viewpoint" discrimination is "not a precise one." *Rosenberger*, —— U.S. at ——, 115 S.Ct. at 2517; accord, *id.* at ——–——, 115 S.Ct. at 2550–51 (Souter, J., dissenting) ("If this amounts to viewpoint discrimination, the Court has all but eviscerated the line between viewpoint and content"; majority's holding is "significant reformulation of our viewpoint discrimination precedents and will significantly expand access to limited-access forums."). See also *Air Line Pilots Ass'n*, 45 F.3d at 1159–60 (showing difficulty in distinguishing between viewpoint discrimination and restrictions on "categories" of speech, such as "political" or "commercial" speech). Under these circum-

stances, it is not unreasonable for managers of public property to retreat to the safest harbor they can find, which is to close the forum, as these defendants have done. These defendants' obvious desire to avoid controversy and to focus their energy and resources on their primary mission rather than umpiring access to a nonpublic forum is a constitutional motivation and not a pretext for any illicit motive here.

In sum, upon careful analysis, the facts here do not show that the defendants closed the forum in order to retaliate against these plaintiffs for exercising their constitutional rights to seek relief from the courts. The Building Authority imposed a facially neutral and constitutional policy for legitimate and constitutional purposes.

## 2. Findings on Claim of Viewpoint Discrimination

To support their claim of hidden "viewpoint" discrimination and the closely related claim of retaliation against plaintiffs' viewpoint, plaintiffs rely on much the same evidence as for their claim for retaliation for litigation. The foregoing discussion finding that the defendants' asserted reasons for closing the forum are legitimate and not pretexts applies to the "viewpoint" claims as well. As discussed above, there is also no direct evidence of hostility toward these plaintiffs' religious views. However, plaintiffs argue that some testimony from the Building Authority directors provides direct evidence of hostility to religion in general. Board members testified that the board intended to prohibit all religious uses of the City–County Building when they adopted the Policy on Seasonal Displays in 1993. Fox Dep. at 71–73; Hokanson Dep. at 28–29; Hohmann Dep. at 51–52. Board minutes also reflect that intention. Pl.Ex. 16. These board members were then asked in depositions whether it was still the board's intention to prohibit all religious use of the building, and they said it was. These answers do not show that the board was hostile to religion and amended Rule 13 *because* it would prohibit religious uses. The record clearly shows that the 1993 Policy on Seasonal Displays was adopted for the purpose of resolving legitimate concerns about the Establish-

ment Clause, not because the board was hostile to religion. Thus, there was no unconstitutional motive in the adoption of the Policy on Seasonal Displays. Nor do the comments that it is "still" the board's intention to bar all religious uses of the building show an unconstitutional motive in 1995. Amended Rule 13 has the effect of prohibiting all religious use of the building's public areas, and the board obviously "intended" that effect. However, it amended the rule in order to serve other purposes by removing all private uses from the public areas. The testimony that plaintiffs cite does not show an unconstitutional motivation to suppress religious speech.

As the Supreme Court said in *Church of Lukumi Babalu Aye v. City of Hialeah:* "Apart from the text, the effect of a law in its real operation is strong evidence of its real object." 508 U.S. at ——, 113 S.Ct. at 2228. The same principle applies to the Building Authority's new rule in deciding whether its object was viewpoint discrimination. The new rule is sweeping. It closes the forum to all private expressive activities regardless of viewpoint or subject matter. The parties submitted evidence last year showing more than one hundred recent uses of the lobby. *Grossbaum,* 63 F.3d at 582 & n. 2. A substantial majority of those uses would be prohibited under the Building Authority's new Rule 13. Most important, there is no evidence here of what the Supreme Court has called "religious gerrymanders." *Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. at ——, 113 S.Ct. at 2227 (quoting *Walz v. Tax Comm'n of New York City,* 397 U.S. 664, 696, 90 S.Ct. 1409, 1425–26, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring)). There is no evidence here that the defendants have tried to finesse definitions or exceptions to a rule so that plaintiffs' and others' religious displays would be prohibited while other, more favored subjects or viewpoints are permitted. Accordingly, this case is not like *Congregation Lubavitch v. City of Cincinnati,* 997 F.2d 1160, 1166–67 (6th Cir.1993), where the city undermined and evaded a facially neutral ordinance regulating private displays by arranging for public sponsorship

of what had previously been private displays that were more to the city's liking.[6]

The sweeping prohibition on all private uses for any subject matter also distinguishes this case from the facts alleged in *Air Line Pilots Ass'n v. Dept. of Aviation*, where the management of O'Hare Airport in Chicago prohibited advertising displays that were critical of a major airline. The government did not close the forum, as the Building Authority did here, but engaged in viewpoint-specific discrimination. 45 F.3d at 1159–60. Perhaps if the Building Authority had imposed narrower restrictions on access, so that only a few uses beyond plaintiffs' menorah display and a few other religious symbols were banned, plaintiffs' claim of viewpoint discrimination might be more plausible. But if we are to find the object in the effect, the effect of Rule 13 is to close the forum, to get the defendants out of the sometimes difficult and expensive business of managing the forum, and to concentrate on defendants' primary mission. Rule 13 is not a guise for viewpoint discrimination.[7]

Plaintiffs have not proved a reasonable likelihood of prevailing on their claims that the defendants changed their rules for any unconstitutional motive. The decision to close the forum to all private displays was facially neutral. Defendants have offered and supported their legitimate reasons for that decision. Plaintiffs have not shown they are likely to prevail in proving that those reasons were pretextual. While the defendants' decision was in part a *response* to this litigation, the decision remedied the constitutional violation and was not motivated by any desire to punish plaintiffs or to get even with them for filing suit. Nor was the decision to prohibit all private displays on any subject a

mask for a desire to prohibit the expression of these plaintiffs' or others' religious beliefs.

## IV. Balance of Harms

At the preliminary injunction stage, the moving party does not need to prove his case beyond dispute. If the balance of harms is lopsided enough, he may not even need to prove he is more likely to prevail than not. In fact, the Seventh Circuit has said that "[i]f the harm to the plaintiff from denial of the preliminary injunction would be very great and the harm to the defendant from granting it very small, then the injunction should be granted even if the defendant has a better chance of prevailing on the merits than the plaintiff, provided the plaintiff's chances are better than negligible; and vice versa." *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982). Accord, *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387–88 (7th Cir.1984).

This is not a case where the harm to plaintiff by the constitutional injury is so great that the prospect justifies an injunction upon a slight showing of likelihood of success on the merits. While it is uniformly held that the loss of free speech rights constitutes irreparable harm, the harm caused by such injuries is not always of the same severity. Here, plaintiffs face the loss of asserted free speech rights, and time is of the essence for their expression to have its intended effect. However, if an injunction is erroneously denied, the lobby of the City–County Building is by no means the only channel for plaintiffs' communication of their views. This fact does not cut against plaintiffs on the merits of their claims of a right to access to the preferred forum, but it does affect at least slightly the weight of the harm plaintiffs

---

6. Many past uses of the City–County Building lobby involved similar "sponsorship" of private activities by government tenants. Mr. Reinking and Mr. Fox testified that the Building Authority does not intend to permit such uses. See Reinking Dep. 66, 86; Fox Dep. 82–83; 138–39. The objective evidence of their conduct is consistent with that approach. See Pl.Ex. 42; see also Pl.Exs. 40, 41. If the actual practice of the Building Authority were to change, some of the questions concerning defendants' motivations here might require a fresh look.

7. The court also rejects plaintiffs' claim that the Building Authority acted as the "handmaiden" of the ICLU and JCRC in suppressing speech they found objectionable. *Cf. Air Line Pilots Ass'n*, 45 F.3d at 1157–58. The Building Authority does not become the agent of everyone it listens to or eventually agrees with. It made its own judgments for legitimate reasons, and unlike the defendant's actions in *Air Line Pilots Ass'n*, the Building Authority's broad policy cannot be characterized as viewpoint discrimination.

would suffer if this court erroneously denied an injunction. See *Cornelius,* 473 U.S. at 809, 105 S.Ct. at 3452–53 (noting channels available to speaker other than the preferred nonpublic forum). On the other side, if an injunction is erroneously granted, the Building Authority is likely to be harmed in the loss of control over the government property it has a duty to manage. The controversy and disruption that may be caused by the placement of private displays in the lobby of the City–County Building are not conjectural, as evidenced by last year's events. But such harm also does not appear to threaten disaster. In neither case is the injury threatened by an erroneous decision so great as to tip the scales significantly one way or the other. This is not a case where the plaintiffs are entitled to an injunction based on a slight possibility of prevailing on their claims. Because plaintiffs have not shown a reasonable likelihood of prevailing on their new claims, plaintiffs' motion for preliminary injunction is denied.

So ordered.